Bruce FRIEDBERG, on behalf of himself and all others similarly situated, Plaintiff,

v.

DISCREET LOGIC INC., Richard J. Szalwinski, David N. Macrae, Gary G. Tregaskis, Douglas R. Johnson and Thomas Cantwell, Defendants.

Civil Action No. 96–11232–EFH.

United States District Court, D. Massachusetts.

March 7, 1997.

Glen DeValerio, Berman, DeValerio & Pease, Boston, MA, Max W. Berger, Douglas M. McKeige, Bernstein, Litowitz, Berger & Grossman, New York City, for Bruce Freidberg.

Peter E. Gelhaar, Donnelly, Conroy & Gelhaar, Boston, MA, David S. Steuer, Denise M. Amantea, Joanne R. Scully, Lloyd Winawer, Wilson, Sonsini, Goodrich & Rosati, Palo Alto, CA, Brian E. Pastuszenski, William L. Prickett, Testa, Hurwitz & Thibeault, Boston, MA, for Discreet Logic Inc., Richard J. Szalwinski, David N. Macrae, Gary G. Tregaskis, Douglas R. Johnson, Thomas Cantwell.

### MEMORANDUM AND ORDER

HARRINGTON, District Judge.

The question before the Court is whether the Plaintiff's Complaint states a claim for fraud under the federal securities laws, 15 U.S.C. § 78j(b), and whether the Plaintiff's Complaint satisfies the heightened pleading standard codified at 15 U.S.C. § 78u–4.

### Standard of Review

The question is raised by a Motion to Dismiss filed pursuant to Fed.R.Civ.P. 12(b)(6) by the defendants. In reviewing this Motion, the Court "must take the allegations

in the complaint as true and must make all reasonable inferences in favor of the plaintiffs." *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir.1993) (citing *Monahan v. Dorchester Counseling Ctr., Inc.*, 961 F.2d 987, 988 (1st Cir.1992)). The Court may grant dismissal only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Roeder v. Alpha Industries, Inc.* 814 F.2d 22, 25 (1st Cir.1987) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957)).

### The Allegations

The Plaintiff, Bruce Friedberg, has filed a securities fraud claim against Discreet Logic, Inc., and several of its officers. His complaint, in substance, alleges that (1) in November of 1995 Discreet Logic, Inc. ("Discreet") issued a Secondary Public Offering ("SPO") of its stock to the purchasing public; (2) at the time of this issuance Discreet had knowledge that new technology, soon to be introduced to the market, would render its current product line obsolete; and (3) that Discreet failed to disclose this information to the prospective purchasers of its stock. His complaint more specifically alleges:

1. Discreet sells computer systems which create special visual effects for feature films and other applications. ¶ 4.[1] It conducted its Initial Public Offering ("IPO") in June, 1995. ¶ 32. In September, 1995, Discreet announced record results for its 1995 fiscal year, ending July 31, 1995, with net income of $ .63 per share, compared with $ .04 per share for fiscal year 1994. Net sales in fiscal year 1995 were $64.5 million, compared with net sales of $15.4 million for fiscal year 1994. ¶ 37.

2. Buoyed by the success of its IPO and its record results for fiscal year 1995, on or about October 5, 1995, Discreet announced that it would commence a SPO. In conjunction with the SPO, Discreet filed a Registration Statement (the "Registration Statement") and Prospectus (the "Prospectus") with the SEC on or about October 5, 1995, signed by defendants Szalwinski, Macrae, Johnson, Cantwell and Tregaskis. ¶ 39.

3. Prior to the November 14, 1995 SPO, certain of Discreet's senior officers, including defendants Szalwinski and Johnson, participated in a "Roadshow" held in major cities to build investor interest in the SPO. At the "Roadshow" meetings these officers made presentations to potential purchasers of Discreet stock. At these presentations defendants Szalwinski and Johnson told potential investors that there were no significant problems with Discreet's business or management and that its future had never been brighter. They confirmed that Discreet would achieve strong sequential quarterly revenue and earnings growth throughout fiscal year 1996, with fiscal 1996 revenues to be over $125 million and fiscal 1996 earnings to be approximately $ .50 per share. These officers assured potential investors that there would be further revenue and earnings per share gains in fiscal year 1997. ¶ 42

4. On November 14, 1995, the Registration Statement and Prospectus for the SPO became effective. Defendants sold 3.2 million Discreet shares to the public at $30.25 per share. Of the 3.2 million shares sold, 1.8 million shares were sold by the Individual Defendants. ¶¶ 40, 41.

5. Defendant Richard J. Szalwinski ("Szalwinski") was Chairman of the Board of Directors of Discreet. In the SPO, he sold 645,944 shares of Discreet, or approximately 11 percent of his holdings, at $28.74 per share (which cost him $ .0005 per share), and *realized profits of $18.5 million.* ¶ 17; Prospectus, pp. 48 and 51.

6. Defendant David N. Macrae ("Macrae") was President and Chief Executive Officer of Discreet. In the SPO, he sold 400,000 shares, or 33 percent of his holdings, at $28.74 per share (which cost him $1.63 per share), and *realized profits of $11.4 million.* ¶ 18; Prospectus, pp. 48 and 51.

7. Defendant Thomas Cantwell ("Cantwell") was a Director of the Company. In the SPO, he sold 383,333 Discreet shares, or approximately 11 percent of his holdings, at

---

1. Paragraph references to Plaintiff's Amended Complaint for Violation of the Federal Securities Laws ("Complaint") are herein designated as "¶ ——."

$28.74 per share, and *realized profits of $11 million.* ¶ 19; Prospectus, pp. 48 and 51.

8. Defendant Gary G. Tregaskis ("Tregaskis") was a Director of the Company. In the SPO, Tregaskis sold 400,000 Discreet shares, or approximately 11 percent of his holdings, at $28.74 per share (which cost him $ .03 per share), and *realized profits of $11.4 million.* ¶ 20; Prospectus, pp. 48 and 51.

9. Defendant Douglas R. Johnson ("Johnson") was a Vice President and Chief Financial Officer of the Company. In the SPO, he sold 20,000 Discreet shares, or approximately 50 percent of his holdings, at $28.74 per share, and *realized profits of $574,800.* ¶ 21; Prospectus, pp. 48 and 51.

10. On or about December 14, 1995, the underwriters of the SPO purchased an additional 383,333 common shares in overallotment shares, which were sold to the investing public at a price of $30.25 per share. Of the 383,333 shares sold, defendant Szalwinski sold 129,080 shares, and defendant Cantwell sold 83,333 shares. Aggregate profits for these Individual Defendants totalled in excess of $6.5 million. The Company itself sold an additional 180,020 shares and reaped profits in excess of $5.1 million. ¶ 54.

11. In May of 1994 Discreet had entered into a Master Value–Added Reseller Agreement (the "VAR Agreement") with Silicon Graphics, Inc. ("SGI") which provided Discreet *advance access* to SGI technology. ¶ 8. In the Prospectus to the SPO, the Company emphasized that the key to its ability to continue to produce its "innovative" technology was because of its close strategic relationship with SGI and because it designed systems that "took advantage" of SGI's computer workstations which enabled Discreet to continue to provide "state-of-the-art digital solutions" and "maintain [its] leading edge technology." The Prospectus noted that *all* of Discreet's systems "currently include workstations manufactured by SGI." ¶¶ 45, 46.

12. The Company touted in the Prospectus the impressive growth in revenue from sales of its FLAME systems which ran on the SGI Onyx Reality Engine2 workstation and that any factors affecting that worksta-

tion would have a material impact on such sales:

sales of FLAME systems will continue to constitute a significant portion of its revenues for the foreseeable future. *Accordingly, any factor adversely affecting sales of FLAME systems could have a material adverse effect on the Company's business and results of operations.* [Emphasis added].

¶¶ 50, 51; Prospectus p. 6.

13. The Prospectus further emphasized that, as a result of the Company's close relationship with SGI, it actually "obtains advance access" to SGI technology:

The company believes that its future success will be based in part on its ability to enhance its existing systems and to introduce new products and features which meet the evolving requirements of creative professionals. In addition, *as a master VAR ["Value Added Reseller"] of SGI workstations, the Company obtains advance access to SGI technology in order to develop compatible systems and to modify and improve existing products.* [Emphasis added].

¶ 46; Prospectus p. 9.

14. The Prospectus also stated that there was a *possibility* that "from time to time, the Company or others *may*" announce products that had the potential to shorten the lifecycle or replace the Company's existing products and that could have a material adverse impact on the Company's results:

from time to time the Company or others may announce products, features or technologies which have the potential to shorten the life cycle of or replace the company's then existing products. Such announcements could cause customers to defer the decision to buy or determine not to buy the Company's products or cause the Company's distributors to seek to return products to the Company, *any of which would have a material adverse effect on the Company's business and results of operations.* In addition, there can be no assurance that products or technologies developed by others will not render the Company's products or tech-

nologies non-competitive or obsolete. [Emphasis added].

¶ 48; Prospectus p. 7.

15. On January 22, 1996, SGI announced the introduction of a visualization computer called Onyx Infinite Reality. According to commentators, it was a "breakthrough system [that] simultaneously processes graphics, imaging and video data in real time" and was "up to 100 times faster than the Onyx Reality Engine2 graphics (which Discreet was then using), previously the world's fastest graphics system." ¶ 55.

16. In connection with SGI's announced introduction of its revolutionary new workstation, Discreet immediately announced "future support for that workstation." According to the Company's announcement, artists using FLAME and INFERNO would be "able to access enhanced performance capabilities from their software when combined with this new advanced hardware." ¶ 56. According to David Swan, the Company's executive vice-president of marketing:

> [t]his new system demonstrates once again the benefits of open systems that *provide an easy upgrade path to state-of-the-art technology* for digital post-production and broadcast environments, compared to traditional proprietary systems ... *Discreet Logic continues to focus on designing tools that take maximum advantage of the industry's leading hardware—Onyx InfiniteReality—to deliver the best solutions for content creators.* (Emphasis added).

Investors greeted this news enthusiastically, propelling the price of Discreet common stock from $20 per share on the day immediately prior to Swan's announcement to $24 per share on January 23, 1996, a day later. Within one week, the price of Discreet common stock had risen to nearly $28 per share. ¶ 57.

17. On February 13, 1996, Discreet announced that its 1996 second quarter revenues and margins were, in fact, devastated by the January, 1996 introduction of SGI's new workstation to the market. The Company said it anticipated earnings between a nominal $ .02–$ .04 per share for its second quarter, ending January 31, 1996, compared with $ .07 for the previous year's second quarter. ¶ 58.

18. Defendant Johnson explained the disappointing financial news by stating that SGI's new workstation forced Discreet to discount products sold in the second quarter, as customers simply refused to purchase the Company's products, which were now rendered obsolete. ¶ 58. Defendant Szalwinski stated that SGI's announcement did not give the Company enough time to renegotiate sales contracts with customers who wanted the new advanced system, stating that the introduction was "something we couldn't deal with in nine days." ¶ 59. The nine days referred to the period from the SGI announcement to the close of the second fiscal quarter.

19. Discreet also announced on February 13, 1996, without explanation, that Defendant Macrae, the Company's President and Chief Executive Officer, had abruptly and unexpectedly resigned. ¶ 61. The market's reaction to the Company's announcements of February 13, 1996 was devastating. Discreet stock plunged $12.50 per share to close at $11.25 per share, a loss of 53 percent. ¶ 62.

20. SGI quickly responded to Discreet's effort to blame SGI for its poor results. As reported by *The Wall Street Journal* on February 14, 1996, according to Dan Vivoli, a SGI spokesman, Discreet "knew for a long time" that the Onyx InfiniteReality announcement *would be made in January,* and that Discreet "could have planned accordingly." These facts were publicly reported in other press reports as follows:

> Silicon Graphics' director of marketing, Dan Vivoli, said Discreet Logic *knew the supercomputer announcement would occur months ahead of time.* [Emphasis added].

> "They had all of the day-to-day (information) to predict what their customers were going to do," Vivoli said.

¶ 60.

21. The announcement of February 13, 1996 relating to the second quarter revenues was followed by subsequent adverse disclosures. On May 2, 1996, the Company reported that it anticipated disappointing revenue

and "a significant net loss" for its 1996 third quarter. The Company further announced that Chief Financial Officer, defendant Johnson, was also resigning. Predictably, the Company's common shares now trade in the range of $7 per share, well beneath the levels where those same shares traded during the Class Period, which were in excess of $30 per share. ¶ 63.

### Pleading Requirements for Securities Fraud

Section 10(b) of the Federal Securities Exchange Act of 1934 makes it unlawful for any person "to use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). One such rule is Rule 10b–5, which makes it unlawful "to make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5 (1995). In order to state a cause of action under Section 10(b) and Rule 10b–5, a plaintiff must plead that the defendant made a false statement or omitted a material fact, with the requisite scienter, and that the plaintiff's reliance on this statement or omission caused the plaintiff's injury. *Shaw v. Digital Equipment Corp.*, 82 F.3d 1194, 1216–1217 (1st Cir.1996).

The Private Securities Litigation Reform Act of 1995 ("PSLRA"), Public Law 104–67 (codified at 15 U.S.C. § 78u–4 (1995)), amends the Securities Exchange Act of 1934 and makes the pleading standard in securities fraud cases more rigorous than Rule 9(b) requirements. Prior to the PSLRA's enactment, Rule 9(b) required a plaintiff to plead "the circumstances constituting fraud ... with particularity." Fed.R.Civ.P. 9(b). The Court of Appeals for the First Circuit held that Rule 9(b) required the complaint to set forth specific facts that made it reasonable to believe that the defendant knew that a statement was materially false or misleading. *Id.* at 1223–1224, citing *Greenstone v. Cambex Corp.*, 975 F.2d 22, 25 (1st Cir.1992).

Under the PSLRA a complaint alleging securities fraud is now required to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all the facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1), Pub.L. No. 104–67 § 21D(b)(1). In addition, to sufficiently allege scienter the complaint is required to "state with particularity facts giving rise to a strong inference that the defendant acted with the requisite state of mind." 15 U.S.C. § 78u–4(b)(2), Pub.L. No. 104–67 § 21D(b)(2). When a complaint fails to meet the above two requirements, dismissal is required. 15 U.S.C. § 78u–4(b)(3), Pub.L. No. 104–67 § 21D(b)(3)(A).

### ANALYSIS

As discussed below, the Amended Complaint satisfies the pleading requirements necessary to maintain an action under the Securities Exchange Act § 10(b) and Rule 10b–5.

#### A. *Misleading Statements and Omissions*

In analyzing a securities fraud complaint, this Court is first required to determine whether the complaint sufficiently identifies each false or misleading statement and adequately identifies why each statement is false or misleading.

The Complaint alleges that the following four statements are false and misleading:

(1) As plead in paragraph 42 of the Amended Complaint, the statements of Defendants Szalwinski and Johnson made to potential investors during the "Roadshow" designed to create investor interest in the offering.

Defendants Szalwinski and Johnson told potential investors that there were no significant problems with Discreet's business or management and that Discreet's future had never been brighter. They confirmed that Discreet would achieve strong sequential quarterly revenue and earnings growth throughout fiscal 1996, with fiscal 1996 rev-

enues of over $125 million and fiscal 1996 earnings of approximately $ .50 per share. They assured potential investors that there would be further revenue and earnings per share gains in fiscal 1997.

(2) As plead in paragraph 48 of the Amended Complaint, the statement in the Prospectus:

> from time to time the Company or others may announce products, features or technologies which have the potential to shorten the life cycle or replace the Company's then existing products. Such announcements could cause customers to defer the decision to buy or determine not to buy the Company's products or cause the Company's distributors to seek to return products to the Company, *any of which would have a material adverse effect on the Company's business and results of operations.* In addition, there can be no assurance that products or technologies developed by others will not render the Company's products or technologies non-competitive or obsolete. (Emphasis added).

(3) As plead in paragraph 51 of the Amended Complaint, the statement in the Prospectus:

> The Company believes that sales of FLAME systems will continue to constitute a significant portion of its revenues for the foreseeable future. *Accordingly, any factor adversely affecting sales of FLAME systems could have a material adverse effect on the company's business and results of operations.* (Emphasis added).

(4) As plead in paragraphs 58 and 59, the statements of Defendant Szalwinski made to the investing public explaining the poor earnings for the 1996 second quarter:

> Silicon Graphics, Inc.'s announcement of the Onyx Infinite Reality, with less than two weeks remaining in our second quarter, came with very aggressive pricing but with anticipated delivery scheduled for later this quarter. SGI's announcement affected planned purchases of FLAME, INFERNO and VAPOUR which run on the Onyx Reality Engine2 and negatively impacted both our revenues and margins.

The announced introduction of the Onyx Infinite Reality was "something we couldn't deal with in nine days."

The Complaint identifies why each of the above four statements are false and misleading. Paragraphs 51 and 66 of the Amended Complaint allege that the Prospectus stated that there was a risk that Discreet or "others" could introduce new products that would render Discreet's existing products obsolete, thereby materially impacting Discreet's sales and earnings. The defendants, however, failed to disclose that such a product, a new advanced computer, had already been created by SGI and was about to be introduced to the market. In addition, they also failed to disclose that this new computer would render Discreet's current product line obsolete within the industry and, thus, materially lower Discreet's revenues and earnings for the second quarter of fiscal year 1996.

### B. *Required State of Mind*

■ The plaintiff and defendants disagree on the required pleading standard relating to scienter. The plaintiff argues that the PSLRA has adopted *in full* the Second Circuit's standard for pleading "a strong inference of scienter." As a result, it is the plaintiff's position that the Second Circuit's case law interpreting this standard is controlling. *See, e.g., Marksman Partners, L.P. v. Chantal Pharmaceutical Corp.,* 927 F.Supp. 1297, 1309–1315 (C.D.Cal.1996). It is the position of the defendants that the PSLRA's pleading standard is higher than the Second Circuit's standard. The defendants argue, therefore, that the Second Circuit's case law addressing motive, opportunity and recklessness is not applicable. *See, e.g., In re Silicon Graphics, Inc. Securities Litigation,* [current] Fed.Sec.L.Rep. [CCH] ¶ 99,325 at 95,-957, 1996 WL 664639 (N.D.Cal.1996). This raises an issue of first impression in the First Circuit.

To support an action under Section 10(b) and Rule 10b–5, a defendant is required to have acted with scienter. *Shaw v. Digital Equipment Corp.,* 82 F.3d at 1217. The Supreme Court has defined the scienter requirement as "a mental state embracing intent to deceive, manipulate or defraud."

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 1381 n. 12, 47 L.Ed.2d 668 (1976). The PSLRA requires, in an action under Section 10(b) and Rule 10b–5, that the complaint state with particularity facts giving rise to a strong inference that the defendant acted with scienter. 15 U.S.C. § 78u–4(b)(3). Prior to the enactment of the PSLRA, a securities fraud plaintiff in the First Circuit was required to state facts with such particularity that made it reasonable to believe that the defendant had acted with scienter. *Shaw v. Digital Equipment Corp.* 82 F.3d at 1223–1224. The PSLRA has essentially raised the pleading standard in this Circuit from a "reasonable belief" standard to one requiring a "strong inference" of scienter. The question is what must a plaintiff plead in order to create this "strong inference" of scienter.

Reviewing the text of the PSLRA, this Court is left with no guidance as to the proper interpretation of the term "strong inference" of scienter. As a result, the Court must look to the legislative history of the PSLRA for such guidance as it might provide as to what is required under the new pleading standard.

The new pleading standard of the PSLRA finds its source in the deliberations of the Congressional Conference Committee. The Conference Committee Report accompanying the PSLRA indicates that the "strong inference" pleading standard was adopted, in part at least, from the Second Circuit's approach to private securities litigation. H.R. Conf. Rep. No. 104–369, 104th Cong., 1st Sess. 41 (1995) ("Conf.Rep."). The Conference Committee regarded the Second Circuit pleading standard as "the most stringent pleading standard" among all of the circuits. Conf. Rep. at 41.

The Second Circuit had recognized two distinct ways in which to plead a "strong inference" of scienter. "The first approach is to allege facts establishing a motive to commit fraud and an opportunity to do so." *In re Time Warner, Inc. Securities Litigation*, 9 F.3d 259, 268–269 (2d Cir.1993). "The second approach is to allege facts constituting circumstantial evidence of either reckless or conscious behavior" from which an intent or scienter may be inferred. *Id.* at 269.

The Conference Committee Report states that,

Because the Conference Committee intends to strengthen existing pleading requirements, it does not intend to codify the Second Circuit's case law interpreting this pleading standard.

For this reason, the Conference Report chose not to include in the pleading standard certain language relating to motive, opportunity or recklessness.

Conf. Rep. at 41 & n. 23.

At the time of the drafting and passage of the PSLRA the Second Circuit pleading standard was already in existence. It is apparent, therefore, that the PSLRA pleading standard was intended to be even stronger than the existing Second Circuit pleading standard. It is also clear that the Conference Committee, therefore, purposely chose not to include in its pleading standard language derived from Second Circuit case law relating to motive, opportunity or recklessness.

That the required pleading standard is to be stronger than the Second Circuit standard is further supported by the fact that the Senate Bill under consideration by the Conference Committee contained language which adopted the Second Circuit standard and its case law. An Amendment to the Senate Bill, filed by Senator Specter, was passed which expressly set forth the pleading standard a plaintiff must meet in specifying the defendant's state of mind. Amend.1985 § 240, 104th Cong., 1st Sess. (1995). The Amendment to the Senate Bill reads as follows:

(b) REQUIRED STATE OF MIND.—

(1) IN GENERAL.—In any private action arising under this title in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this title, specifically allege facts giving rise to a strong inference that the defendant acted with the required state of mind.

(2) STRONG INFERENCE OF FRAUDULENT INTENT.—For purposes of paragraph (1), a strong inference that the defendant acted with the required state of mind may be established either—

> (A) by alleging facts to show that the defendant had both motive and opportunity to commit fraud; or

> (B) by alleging facts that constitute *strong* circumstantial evidence of conscious misbehavior or recklessness by the defendant. (Emphasis added).

141 Cong. Rec. §. 9170 (June 27, 1995).

This Senate Bill and this Amendment were *not* adopted by the Conference Committee.

"Few principles of statutory construction are more compelling than the proposition that Congress does not intend sub silentio to enact statutory language that it has earlier discarded in favor of other language." *INS v. Cardoza–Fonseca*, 480 U.S. 421, 442–443, 107 S.Ct. 1207, 1219, 94 L.Ed.2d 434 (1987) (quoting *Nachman Corp. v. Pension Benefit Guaranty Corporation*, 446 U.S. 359, 392–393, 100 S.Ct. 1723, 1741–1742, 64 L.Ed.2d 354 (1980) (Stewart, J., dissenting). In formulating the state of mind pleading standard for the PSLRA, the Conference Committee had the Senate Bill before it, yet, it adopted a different standard which eventually was passed into law. "The Conference Committee's deletion of the Second Circuit standard from the final bill 'strongly militates against a judgment that Congress intended a result that it expressly declined to enact.' " *In re Silicon Graphics, Inc. Securities Litigation*, Fed.Sec.L.Rep. ¶ 99,325 at 95,962 (quoting

*Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186, 200, 95 S.Ct. 392, 401, 42 L.Ed.2d 378 (1974)).

The Conference Committee chose not to codify the Second Circuit's case law relating to motive, opportunity and recklessness because these approaches to pleading a "strong inference" of scienter were not sufficiently stringent. It is important to note, however, that in the Second Circuit there was available *one additional approach* to pleading a "strong inference" of scienter. In addition to motive and opportunity or recklessness, a plaintiff could plead a "strong inference" of scienter by alleging facts constituting circumstantial evidence of *conscious behavior*.

The "conscious behavior" pleading approach is more stringent than the motive and opportunity approach to pleading scienter.[2] "Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the *strength* of the circumstantial allegations must be correspondingly greater." (Emphasis added). *Beck v. Manufacturers Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir.1987) (internal citations omitted). The "conscious behavior" approach is more stringent because the plaintiff's allegations must be supported by "strong" circumstantial evidence.

The Conference Committee Report retained the "conscious behavior" pleading approach and under Second Circuit case law the strength of the evidence needed to constitute conscious behavior is greater than that required for the motive and opportunity or reckless behavior approaches. In determining what the term "strong inference of

---

**2.** Although the distinction between pleading conscious behavior as opposed to motive and opportunity is clear, attempting to distinguish conscious behavior from reckless behavior is a murky area of law in the Second Circuit. *See In re Leslie Fay Companies, Inc. Securities Litigation*, 835 F.Supp. 167, 172 (S.D.N.Y.1993). It appears that conscious behavior and recklessness have merged to the point that for Section 10(b) purposes *conscious behavior can take the form of intent to defraud, knowledge of the falsity or a reckless disregard for the truth. Ades v. Deloitte & Touche*, 799 F.Supp. 1493, 1498–1499 (S.D.N.Y.1992). Reckless behavior "is, at the least, conduct which is 'highly unreasonable' and which represents 'an extreme departure from the

standards of ordinary care ... to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.' " *Rolf v. Blyth, Eastman Dillon & Co., Inc.*, 570 F.2d 38, 47 (2d Cir.1978), *cert. denied*, 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978) (quoting *Sanders v. John Nuveen & Co.*, 554 F.2d 790, 793 (7th Cir.1977). In light of the fact that the PSLRA has eliminated recklessness, this Court is of the opinion that conscious behavior can now only take the form of circumstantial evidence indicating intent to defraud or knowledge of the falsity. The "conscious behavior" pleading approach is, thus, more stringent than the "reckless behavior" approach.

scienter" would require, this Court rules that the plaintiff must set forth specific facts that constitute strong circumstantial evidence of conscious behavior by defendants.

■ The plaintiff here alleges three specific facts that constitute circumstantial evidence of conscious misbehavior by defendants. When these facts are examined in the aggregate, they amount to a "strong inference of scienter."

First, the Complaint asserts that the defendants entered into a VAR Agreement in May of 1994 which gave Discreet advance access to SGI technology. ¶ 8. The Prospectus to the SPO published by the defendants, at page 9, promotes this fact: "as a master VAR of SGI workstations, the Company gains advance access to SGI technology in order to develop compatible systems and to modify and improve existing products." ¶ 46. This statement in the Prospectus shows that Discreet had an awareness of the introduction of the SGI Onyx Infinite Reality prior to January 22, 1996.

Second, the Complaint asserts that the defendants had knowledge of SGI's forthcoming announcement "months ahead of time." ¶ 60. SGI's Director of Marketing, Dan Vivoli, on the day after Discreet announced that its second fiscal quarter earnings were devastated by SGI's announcement of its advanced computer, stated publicly that Discreet had known about the introduction of the new computer "for a long time" and "could have planned accordingly." ¶ 60. This statement is accorded great evidentiary value in light of the fact that it was made by a party who had previously contractually agreed to provide SGI with the advance access to its technology.

Third, the Complaint asserts that the defendants held the IPO in June of 1995. ¶ 32. The SPO occurred on November 14, 1995. ¶ 40. The sale of the overallotment shares occurred on December 14, 1995. ¶ 54. The five corporate officers who signed the Prospectus, combining the profits from the SPO and the overallotment sales, realized nearly $59.4 million in personal profits. Defendant Szalwinski realized profits of $22.5 million; Defendant Macrae profited $11.4 million (selling 33 percent of his holdings); Defendant Cantwell profited $13.5 million; Defendant Tregaskis profited $11.4 million; and Defendant Johnson profited $574,800 (selling 50 percent of his holdings). This type of profittaking, when armed with information that your current product line is about to become obsolete, is evidence of conscious misbehavior.[3]

It is the defendants' position that the plaintiff alleges no specific facts supporting a "strong inference" that the defendants knew on or before the SPO on November 14, 1995 that the new SGI workstation would impact the sales of FLAME systems for the fiscal quarter ending January 31, 1996. They argue that no contemporaneous facts are alleged showing that any defendant knew that the statements in the Prospectus were false or misleading. As a result, the defendants argue that what the plaintiff is, in effect, doing is alleging "fraud by hindsight." *Greenstone v. Cambex Corp.*, 975 F.2d 22, 25 (1st Cir.1992) (quoting *Denny v. Barber*, 576 F.2d 465, 470 (2d Cir.1978)).

The plaintiff, however, has alleged more than "fraud by hindsight."[4] *Ibid.* Discreet

---

3. The defendants under the terms of the IPO were precluded from selling their stock for six months because of a lockout clause. The SPO occurred a month and a half before the lockout clause expired. Under the terms of the lockout clause the defendants could not have sold their stock until January, 1996, which just so happened to be the month that SGI announced the new supercomputer. Accepting the plaintiff's position that the defendants had knowledge of SGI's technology prior to the SPO and knowledge that the new supercomputer would be introduced in January, the undertaking of the SPO can be viewed as the defendants' circumventing the lockout agreement and profittaking before

the January SGI announcement. These factors are overwhelming circumstantial evidence of conscious misbehavior. These facts, however, were not pleaded and as a result the Court shall not consider them in its final analysis. *See* Defendants' Reply Memorandum in Support of their Motion to Dismiss Amended Complaint, at page 11.

4. The defendants rely on the cases of *Gross v. Summa Four, Inc.*, 93 F.3d 987 (1st Cir.1996), and *Greenstone v. Cambex Corp.*, 975 F.2d 22 (1st Cir.1992), for the proposition that a plaintiff has not plead fraud with the requisite particularity where the plaintiff fails to allege precisely when

admits in the Prospectus that it had advance knowledge of SGI products and SGI stated that Discreet had known about the new computer "for a long time" prior to the January 22, 1996 announcement. The SPO occurred less than two and one-half months before the introduction of the new computer. The sale of overallotment shares occurred only five weeks before SGI's announcement.[5] Looking at the evidence in the light most favorable to the plaintiff, the plaintiff has alleged sufficient facts to raise a "strong inference" that the defendants had knowledge of the introduction of the supercomputer prior to the SPO and its negative impact on Discreet's revenues.

The defendants also claim that the five individual defendants, collectively, sold only twelve percent of their total holdings and argue that the sales of such a small percentage do not support an inference of an intent to commit fraud. *In re Apple Computer Securities Litigation*, 886 F.2d 1109, 1117–1118 (9th Cir.1989). In *Apple*, the United States Court of Appeals for the Ninth Circuit held that no inference of fraud could be drawn where defendants collectively sold only eight percent of their holdings, even though defendants' sales netted them approximately $84 million. Moreover, it is the defendants' contention that by retaining the vast majority of their shares during the stocks' decline actually rebuts any inference of fraud. *In re Worlds of Wonder Securities Litigation*, 35 F.3d 1407, 1427 (9th Cir.1994), *cert. denied*, —— U.S. ——, 116 S.Ct. 185, 277, 133 L.Ed.2d 123, 197 (1995).[6]

Although the five individual defendants, collectively, sold only twelve percent of their entire stock holdings, the plaintiff points out that Defendant Macrae sold 33 percent and Defendant Johnson sold 50 percent of his holdings. It is well settled that allegations of insider trading in suspicious amounts or at suspicious times permit the inference to be drawn that both trader and company possessed material non-public information at the time of the sale. *Shaw v. Digital Equipment Corp.*, 82 F.3d at 1224. In *Shaw*, the Court of Appeals for the First Circuit found that insider sales by two corporate employees, one selling 68 percent and the other selling 20 percent of his holdings, provided evidentiary support for the plaintiff's claim.

One cannot lose sight of the context in which the five individual defendants' sales were made. The temporal proximity between an alleged misstatement and the later disclosure of inconsistent information can provide some circumstantial factual support of the defendants' scienter. *Id.* at 1225. This case is not simply a situation where the individual defendants are merely allowing their existing shares, issued on the market as the result of Discreet's IPO, to be traded while being aware of SGI's pending announcement and the resulting obsolescence of Discreet's current products. Instead, while aware of the pending announcement and resulting obsolescence, the five individual defendants, by initiating a SPO, issued 3,583,333 additional Discreet shares. Of the nearly 3.6 million shares sold, in excess of 2 million shares belonged to the five individual defendants. It is both the amount *and* the

---

the defendants' knowledge was obtained. *Summa Four* involved a situation where the plaintiff was trying to establish that a corporate disclosure was fraudulent when made by a document written five weeks after the disclosure was made. *Gross v. Summa Four, Inc.*, 93 F.3d at 995. *Greenstone* involved a situation where the plaintiff was trying to establish fraud by inferring from the filing of a *later* lawsuit that the defendant had earlier knowledge that such a lawsuit was likely. *Greenstone v. Cambex Corp.*, 975 F.2d at 25–26. In both of these cases it was ruled that this plaintiff could not establish fraudulent intent simply by relying on facts which materialized after the alleged misstatements occurred. The instant plaintiff in no way is relying on facts which materialized *after* the alleged misstatements were made in the Prospectus.

5. It is important to note that even at this late date Discreet did nothing to inform prospective purchasers of its stock.

6. These two cases can be distinguished from the facts in the instant case. First of all, both *Apple* and *Worlds of Wonder* were decided on summary judgment, not on a motion to dismiss. Both cases, moreover, maintain the position that insider trading in suspicious amounts or at suspicious times is probative of scienter. *In re Apple Computer Sec. Litig.*, 886 F.2d at 1117; *In re Worlds of Wonder Sec. Litig.*, 35 F.3d at 1427. When full discovery had been completed, the questionable patterns of stock trading were adequately explained away in both cases.

timing of the sale which, with the other evidence discussed, provide strong circumstantial evidence of conscious misbehavior.

The new securities legislation was enacted by the Congress to provide the courts with the authority to summarily dismiss a complaint which fails to strongly establish a factual basis for the claim that a defendant made false representations with fraudulent intent when engaged in securities transactions. This case does not fit within that category. Motion to Dismiss is denied.

SO ORDERED.