Jesse P. LIRETTE, Sr., Robert W. Benzinger, Andre Kraiem, and Victor Kraiem, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

SHIVA CORPORATION, Frank A. Ingari, Cynthia A. Deysher and David S. Cole, Defendants.

No. Civ.A. 97–11159–WGY.

United States District Court, D. Massachusetts.

Nov. 19, 1998.

---

Jeffrey S. Abraham, Milberg, Weiss, Bershad, Spechtrie & Lerach, New York City, for Consolidated plaintiffs.

William H. Paine, Jeffrey B. Rudman, James J. Nicklaus, Hale & Dorr, Boston, MA, for defendants.

David Pastor, Gilman & Pastor, Boston, MA, for Joseph Dibenidetto, movant.

Steven Schulman, Lori G. Feldman, William C. Fredericks, Kim Elaine Miller, Milberg, Weiss, Bershad, Spechtrie & Lerach, New York City, Arnold Levin, Levin, Fishbein, Sedran & Berman, Philadelphia, PA, Barbara A. Podell, Savett, Frutkin, Podell & Ryan, P.C. Philadelphia, PA, David Bershad, Sanford P. Dumain, Milberg, Weiss, Bershad, Hynes & Lerach, New York City, Lawrence Soicher, Law Offices of Lawrence Soicher, New York City, Richard S. Schiffrin, Andrew L. Barroway, Schiffrin & Craig, Ltd, Bala Cynwyd, PA, David Jaroslawicz, Jaroslawicz & Jaros, New York City, Stuart H. Savett, Savett Frutkin Podell & Ryan, PC, Philadelphia, PA, Nancy F. Gans, Moulton & Gans, LLP, Boston, MA, Stephen Moulton, Moulton & Gans, Boston, MA, for plaintiffs.

## MEMORANDUM AND ORDER

YOUNG, District Judge.

## I. BACKGROUND

In 1995, Congress enacted legislation attempting to wrest control over securities fraud class action lawsuits from the plaintiffs' bar devoted to such litigation and confer it upon counsel for larger institutional investors. *See* Private Securities Litigation Reform Act ("PSLRA"), Publ L. No. 104–67 codified at 15 U.S.C. § 78u–4 (1995).[1] Such a measure, it was believed, would cut down on frivolous litigation as counsel for institutional investors were thought to take a more balanced cost-benefit view of such litigation.[2]

While at it, Congress raised the hurdle a plaintiff would have to jump before being permitted to present her case to a jury.[3]

---

1. Legislative history makes it clear that shifting control of securities class action litigation to counsel for institutional investors was a driving force behind the enactment of the PSLRA. H.R .Conf.Rep. No. 369, 104th Cong., 1st Sess., at 13700 (1995) ("[T]he Conference Committee believes that several new rules will effectively discourage the use of professional plaintiffs" and that "increasing the role of institutional investors in class actions will ultimately benefit shareholders and assist courts by improving the quality of representation in securities class actions.").

2. *See id.* ("[i]nstitutional investors ... with large amounts at stake will represent the interests of the plaintiff class more effectively than class members with small amounts at stake."). This goal of the legislation appears largely to have failed. "[F]or better or worse, it is clear today that the expected reduction in class-action suits by shareholders never happened." Steve Bailey & Steven Syre, *'95 reform fails to limit class-action lawsuits by shareholders*, Boston Globe, April 22, 1998, at F1. Undaunted, the securities industry has continued to press—with significant success—for complete preemption of state securities law regulation, except apparently for the law of Delaware. *See* Securities Litigation Uniform Standards Act of 1998 Pub.L. No. 105–353.

3. For anyone who thinks the right to bring a case before an American jury is an arcane matter, one that concerns only lawyers and judges, consider:

> Slowly, sometimes imperceptibly, always without quite knowing what we are doing, Americans are turning away from our civil jury system. Depending on the context, the rationale is generally the same—there is the perception that too many baseless cases get too far and, in so doing, eat up too much of our national productivity.
>
> Enshrined in our Constitution and central to our concepts of citizen participation in government, the jury system is rarely the subject of frontal assault. *But see,* David Shapiro & Daniel Coquillette, *The Fetish of Jury Trials in Civil Cases: A Comment on Rachal v. Hill,* 85 Harv. L.Rev. 442 (1971). Rather, it is attacked by indirection, a casualty of other policy goals which at the time seem compelling. The pattern, however, is unmistakable. In various permutations and to varying degrees it goes something like this: federal preemption ousts state remedies (where the civil jury trial right is frequently fixed in the state constitution) and replaces them with some degree of federal regulation, which may or may not include a jury trial remedy. Even where a jury trial is theoretically possible in federal court, today

## II. THE PRESENT CASE

This is a consolidated putative class action alleging violations of the Securities Exchange Act of 1934 ("the Exchange Act") by Shiva Corporation ("Shiva" or "the company") and three individual defendants. The plaintiffs (here called "Lirette" for simplicity's sake) allege violations of section 10(b) and Rule 10b–5 [4] promulgated thereunder (Count One)

that right is increasingly ephemeral. Today, the price tag for engaging in a vast array of economic activity carries with it the requirement that an individual abandon the Seventh Amendment right to a jury trial and accept instead industry supervised arbitration. *But see, Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 995 F.Supp. 190 (D.Mass.1998) (Gertner, J.) (defendant's motion compelling arbitration denied). Certain cases properly in federal court are further regulated by heightened requirements for fact pleading that force a plaintiff to lay out the case at the outset without the benefit of discovery. Indeed, on this issue the federal judiciary itself appears to have faded from dynamism into stasis in its willingness to accept a diminished, less representative, and thus sharply less effective civil jury, *see* Judith Resnik, *Changing Practices, Changing Rules: Judicial and Congressional Rulemaking on Civil Juries, Civil Justice and Civil Judging*, 49 Ala.L.Rev. 133, 137–52 (1997) (decrying the failure of the Judicial Conference to restore twelve-person juries in civil cases); *Development in the Law—The Civil Jury*, 110 Harv.L.Rev. 1408, 1466–89 (1997) (same); *See also* Michael J. Saks, *Small–Group Decision Making and Complex Information Tasks*, 26, 30 (Federal Judicial Center 1981), along with curbs on the number of judges devoted to jury trials. Leonidas Ralph Mecham, *Optimal Utilization of Judicial Resources* (1996) 14 (For the first time in the entire history of the Republic, Congress was notified in 1996 that "[t]he Judicial Conference is considering whether it should ... recommend that [district court judgeships] be eliminated or left vacant.").

Our willingness as a society to drift away from the use of civil juries reflects a failure in understanding of the jury's essential function in our American democracy. The jury system is direct democracy at work. It is, in fact, the most vital expression of direct democracy in America. Today, it is the new England town meeting writ large, the people themselves governing. In fact, the very processes of our judicial system themselves vindicate and strengthen democracy by involving litigants with standing in the application of our laws. *See* Christopher J. Peters, *Adjudication as Representation*, 97 Colum.L.Rev. 312 (1997). Our juries are the ultimate realization of our people working together, under law, to do justice. De Tocqueville recognized with masterful clarity that, in our jury system, Americans had embarked on a stunning experiment in direct popular rule. *See* Alexis de Tocqueville, *Democracy in America*, 337–39 (Schocken 1st ed.1961). Studies show that where people have recourse to a jury trial, inequalities in economic re-

sources are minimized, most potential litigants avoid staking out patently unreasonable positions, and the great bulk of cases ultimately settle. Marc Galanter, *Viewpoint—How To Improve Civil Justice Policy*, 77 Judicature 185 (1994).

 . . . . .

"Whenever Congress extinguishes a right which heretofore has been vindicated in the courts through citizen juries, there is a cost. It is not a monetary cost. It is a cost paid in rarer coin—the treasure of democracy itself." *Andrews–Clarke v. Travelers Ins. Co.*, 984 F.Supp. 49 n. 74 (D.Mass.1997).

When people recognize that they have been cut off from their opportunity to govern directly through citizen juries, the sense of government as community, as a shared commonwealth, is severely diminished. Jury service is the citizen's only direct experience of government at the federal level. Severing that shared bond, of course, leaves citizens with their right to vote but, inevitably, as the government draws away from its citizenry, that right seems less valuable. It is not too much to say that, as our government is the ultimate teacher, Louis Brandeis, *True Americanism*, Brandeis on Democracy, 25, 27 (Philippa Strum ed., 1995), its devaluation of direct citizen participation carries the implicit message that communitarian efforts are simply not worth very much in an age of individual self seeking. *See* Sam Roberts, *Alone in the Vast Wasteland*, N.Y. Times, Dec. 24, 1995, at D3.

Nor is this all. As those institutions that empower and reinforce community efforts fray at the edges and fall into desuetude, economic powers to which the law grants an advantage, naturally tend to use that advantage unchecked by the jury's common sense. *See Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 355, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979) (Rehnquist, J., dissenting).
William G. Young, *America's Civil Juries ... going, going, Gone?* 4 Legal Network News No. 2 at 1 (1998) (footnotes omitted).

4. Section 10(b) of the Exchange Act makes it unlawful for any person "[t]o use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe...." 15 U.S.C. § 78j(b). The regulations that correspond to Rule 10b–5 make it unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading...." 17 C.F.R. § 240.10b–5 (1998).

and section 20(a)[5] (Count Two) of the Exchange Act. The action is brought on behalf of purchasers of Shiva common stock during the period of September 10, 1996 through and including March 31, 1997 ("the class period"). Lirette complains of a fraudulent scheme and deceptive course of business that injured purchasers of Shiva stock during the class period. The defendants now move to dismiss the Supplement to the Consolidated Amended Class Action Complaint.

## III. BACKGROUND

### A. The Defendants

Shiva manufactures remote access computer networking products. Remote access products enable users of remote computers (such as personal computers or those located in the branch office of a business) to access an existing central computer network (such as the Internet or a business's local area network) and its stored data and other resources as if those remote users were directly connected to the central computer network. Shiva's leading product line at all times relevant to this action was the LanRover remote access product line, which Shiva introduced in 1992. This product line included the high-capacity LanRover Access Switch, which Shiva introduced in 1996.

The defendant Frank A. Ingari ("Ingari") was, at all relevant times, Chief Executive Officer and President of Shiva and Chairman of Shiva's Board of Directors.

The defendant Cynthia A. Deysher ("Deysher") was, at all relevant times, Chief Financial Officer of Shiva until she resigned from that position and left the company on or about March 31, 1997, the last day of the class period.

The defendant David C. Cole ("Cole") was, at all relevant times, a member of Shiva's Board of Directors and served as a member of the Compensation and Audit Committees. During the class period, Cole sold 50,000 shares of Shiva common stock for approximately $1,900,000.

### B. Lirette's Claims

Lirette alleges that during the class period, the defendants falsely portrayed Shiva as a vibrant company with strong growth in sales, revenues, and earnings in its market. He further alleges that, during the class period, the defendants filed quarterly reports and other financial statements with the SEC that falsely represented that they had been prepared in accordance with Generally Accepted Accounting Principles ("GAAP"), and that purported to confirm the defendants' representations about Shiva's sales, revenues, receivables, earnings, and inventories.

According to Lirette, Shiva's officers and directors knew during the class period—but did not disclose—that demand for its products had weakened. Consequently, he maintains, the defendants artificially inflated the company's reported sales, receivables, revenues, and earnings. Lirette further alleges that the defendants engaged in "channel stuffing," a practice whereby Shiva recognized revenue upon the shipment of products to its distributors and resellers, whom Shiva induced to purchase more products than they needed through a generous return policy, price promotions, and strong-arm sales tactics. Courts have found that "channel stuffing" is actionable under the Exchange Act. See In re Lotus Dev. Corp. Sec. Litig., 875 F.Supp. 48, 52–53 (D.Mass.1995) (Saris, J.); Harvey M. Jasper Retirement Trust v. Ivax Corp., 920 F.Supp. 1260, 1266 (S.D.Fla.1995); In re Compaq Sec. Litig., 848 F.Supp. 1307, 1320 (S.D.Tex.1993).

In addition, Lirette alleges that, throughout the class period, Shiva affirmatively and materially misrepresented its product return policy. While the company maintained that distributors and resellers could return products within a certain time period for particular reasons, Lirette maintains that Shiva's policy actually allowed purchasers to make returns at any time and for any reason. Lirette alleges that this policy resulted in a distortion of the company's revenues in violation of GAAP.

---

**5.** Under section 20(a) of the Exchange Act, any person who "controls" someone who violates the Exchange Act is liable for the violation. See 15 U.S.C. § 78t(a). Without a primary violation of the securities law, there can be no liability under section 20(a). See Suna v. Bailey Corp., 107 F.3d 64, 72 (1st Cir.1997).

Lirette further asserts that the defendants' scheme artificially inflated the price of Shiva stock, thereby enabling the defendant Cole to pocket approximately $1,900,000 from the sale of 50,000 shares during the class period.

Lirette contends that when the truth about Shiva's revenues reached the market in the first quarter of 1997, shares of Shiva stock sank more than eighty-six percent from a class period high of $63.50 per share, to a low of $8.75 per share.

### C. Procedural History

Lirette filed suit on May 21, 1997 and subsequently filed a Consolidated Amended Class Action Complaint on November 21, 1997. On March 2, 1998, the defendants moved to dismiss. Finding plaintiff's Consolidated Amended Class Action Complaint unacceptable under the PSLRA, this Court ordered Lirette to file a "Supplement" specifying, as to each particular allegation, whether that allegation was made upon information and belief or was supported by some document or statement on personal knowledge by a potential witness. *See Lirette v. Shiva Corp.*, 999 F.Supp. 164 (D.Mass.1998) (order requiring plaintiffs to file Supplement to Consolidated Amended Class Action Complaint). Lirette complied with that order, and the defendants' motion to dismiss the Supplement to Consolidated Amended Class Action Complaint ("the Complaint") is now before the Court.

### IV. Legal Analysis

#### A. Standard of Review

In reviewing a motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court must "take the allegations in the complaint as true and grant all reasonable inferences in favor of the plaintiff." *Monahan v. Dorchester Counseling Ctr.*, 961 F.2d 987, 988 (1st Cir.1992). The Court may grant dismissal only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Roeder v. Alpha Indus.*, 814 F.2d 22, 25 (1st Cir.1987) (quoting

*Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99 [1957]).

### B. Pleading Standards

In a securities action, two additional considerations bear upon the motion to dismiss: Federal Rule of Civil Procedure 9(b) and the PSLRA. Both Rule 9(b) and the PSLRA concern the legal sufficiency of the complaint; they do not affect the substantive elements of a claim that Lirette ultimately must prove.

Rule 9(b) imposes a heightened pleading requirement on plaintiffs alleging fraud: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R.Civ.P. 9(b). The special pleading requirement in the fraud context has three primary purposes: "to place the defendant on notice; to safeguard defendants from unwarranted damage to their reputations; and to protect defendants from the danger of strike suits." *In re Lotus Dev. Sec. Litig.*, 875 F.Supp. at 51 (citing *New England Data Servs. v. Becher*, 829 F.2d 286, 289 [(1st Cir.1987)]). A "strike suit" refers to a largely groundless claim brought by a plaintiff who thereafter engages in extensive discovery to increase settlement value rather than to discover relevant evidence of fraud. *See id.*

Like Rule 9(b), the PSLRA seeks to "do away with the kind of lawsuit that happens because a companies' [sic] stock drops, a suit is filed, they press discovery and they move and collect a large settlement from the company, when the suit may be baseless." 104 Cong.Rec. S19,063 (daily ed. Dec. 21, 1995) (statement of Sen. Feinstein). Among other changes to the securities laws, the PSLRA makes the pleading standard in securities fraud cases even more rigorous than Rule 9(b) traditionally has required.[6] Under the PSLRA a complaint alleging securities fraud must set forth "each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15

---

**6.** Congress passed the PSLRA over the veto of President Clinton, who called the heightened pleading requirements "an unacceptable proce-

dural hurdle to meritorious claims being heard in Federal courts." 104 Cong.Rec. H15,214 (daily ed. Dec. 20, 1995).

U.S.C. § 78u–4(b)(1). In addition, in order sufficiently to allege scienter, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). When a complaint fails to meet the above two requirements, dismissal is required. *See* 15 U.S.C. § 78u–4(b)(3)(A).

■ Such heightened scrutiny is hardly new to this Circuit, which traditionally has set the bar for securities plaintiffs quite high under Rule 9(b). *See, e.g., Gross v. Summa Four, Inc.,* 93 F.3d 987, 991 (1st Cir.1996) ("We have been especially strict in demanding adherence to Rule 9[b] in the securities context. . . ."); *Romani v. Shearson Lehman Hutton,* 929 F.2d 875, 878 (1st Cir.1991) ("We have been especially rigorous in demanding such factual support in the securities context. . . .").Pleadings based on information and belief, without specifying the source of the information and the reasons for the belief, do not pass muster under the First Circuit interpretation of Rule 9(b). *See Romani,* 929 F.2d at 878; *New England Data Servs.,* 829 F.2d at 288. To survive a motion to dismiss, a complaint alleging fraud must specify (1) the statements that the plaintiff contends were fraudulent, (2) the identity of the speaker, (3) where and when the statements were made, and (4) why the statements were fraudulent. *See Suna v. Bailey Corp.,* 107 F.3d 64, 68 (1st Cir.1997) (citing *Shields v. Citytrust Bancorp,* 25 F.3d 1124, 1127 [2d Cir.1994] ).

■ Furthermore, as to scienter, the courts of this Circuit already require a securities plaintiff "to allege facts that give rise to a strong inference of fraudulent intent." *Id.* (quoting *Shields,* 25 F.3d at 1128) (citations and internal quotation marks omitted). A securities plaintiff must allege "specific facts that make it reasonable to believe that defendant knew that a statement was materially false or misleading." *Greenstone v. Cambex Corp.,* 975 F.2d 22, 25 (1st Cir.1992). Citing the *Greenstone* language, the First Circuit recently noted that "we do not interpret the [PSLRA] standard to differ from that which this court has historically applied." *Maldo-nado v. Dominguez,* 137 F.3d 1, 9 n. 5 (1st Cir.1998) (citing *Greenstone,* 975 F.2d at 22).

### 1. Misrepresentations and Omissions

The Court follows the mode of analysis it adopted in *Colby v. Hologic, Inc.,* 817 F.Supp. 204 (D.Mass.1993) and *In re Computervision Corp. Sec. Litig.,* 914 F.Supp. 717 (D.Mass.1996), *aff'd, Glassman v. Computervision Corp.,* 90 F.3d 617 (1st Cir.1996).

The Complaint lists twenty-one allegedly false misrepresentations and omissions. They tend to fall into three general categories: (1) statements made in press releases, conference calls, and interviews, *see* Comp. ¶¶ 59, 61, 74, 76, 83, 86, (2) statements made in SEC filings, *see* Comp. ¶¶ 7, 65–67, 103, 105–07, and (3) statements made to securities analysts, *see* Comp. ¶¶ 53, 55, 63, 64, 68, 80, 85, 89, 90.

### (a) Press Releases, Conference Calls, and Interviews

■ Lirette maintains that the defendants disseminated the following seven misrepresentations or omissions through press releases, conference calls, and interviews during the class period:

● On or about October 18, 1996, Ingari stated in a press release: "We are pleased with the results of this quarter, continuing the solid performance we have maintained over the last year. Growth in our core strategic product areas—LanRover Access Switch, LanRover and the AccessPort client router—is strong. We are encouraged by the continuing momentum for the LanRover Access Switch, including significant sales closed and trials underway in corporate enterprises, carriers and ISPs as well as key industry wins in the first major test lab evaluation of central site access concentrators. Traditional LanRover products grew meaningfully, with particular strength in non-OEM [Original Equipment Manufacturer] channels [i.e., in distributor and reseller channels]." Comp. ¶ 58–59.

● Shortly after the issuance of the October 18, 1996 press release, Ingari and/or Deysher stated during a conference call that the company was "comfortable" with its earnings estimates. *Id.* ¶ 61.

- As reported by *Reuters* on January 7, 1997, Deysher stated during a phone interview: "We didn't ship out as much product as originally planned. Some of that was because we wanted to lower our inventory in the channel. Some of it was we didn't receive all the orders we expected." *Id.* ¶ 74.

- As reported by *Reuters* on January 7, 1997, Deysher stated during a phone interview: "We are expected to grow going forward. I think we are better positioned." *Id.* ¶ 76.

- On January 7, 1997, Ingari stated during a conference call with analysts: "[W]e have a pretty healthy channel right now and we will enter Q2 with a very, very healthy channel." He further represented that the company was "within shooting distance" of the desired inventory level of about 7–8 weeks. *Id.* ¶ 76.

- Between January 13, 1997 and January 24, 1997, Shiva several times announced with fanfare the linkage of Powerburst technology with the LanRover product line in a series of strategic disclosures to the media as well as formal press releases. *Id.* ¶ 83.

- On January 23, 1997, Ingari stated in a press release: "As previously announced on January 7, 1997, developments late in the quarter, including orders not received from some of our channel partners, prevented us from meeting consensus revenue and earning expectations. Nonetheless, in 1996 we ... introduced many new products including the strategic LanRover Access Switch, and further expanded our partner and distribution channels.1996 has been a transition year for Shiva. This year we transitioned our business from predominant reliance on the stackable fixed port LanRover remote access server to a more balanced mix that includes the award winning LanRover Access Switch concentrator, which is targeted for the high-growth, high-end enterprise market." *Id.* ¶ 86.

Although the Complaint specifies the content, time, place, and speaker for most of these statements, such detail is not enough to survive a motion to dismiss. *See Romani,* 929 F.2d at 878. Plaintiffs also must specify *why* these statements were fraudulent, *see Suna,* 107 F.3d at 68 and, moreover, must rely on more than "information and belief" in doing so, *see* 15 U.S.C. 78u–4(b)(1); *Romani,* 929 F.2d at 878; *New England Data Servs.,* 829 F.2d at 288.

Lirette has not met this burden. As to the statements in paragraph 74, Lirette provides no explanation as to why they are false. *See* Comp. ¶ 74. As to the statements in paragraphs 59, 61, 76, and 86, Lirette's theories as to why these statements are fraudulent rest solely on information and belief.[7] *See* Comp. ¶¶ 60, 61, 76, 87. Both the PSLRA and this Circuit's pre-PSLRA cases require Lirette to set forth with particularity the facts on which that belief is formed. *See* 15 U.S.C. 78u–4(b)(1); *Romani,* 929 F.2d at 878; *New England Data Servs.,* 829 F.2d at 288. By way of introduction, the Complaint explains that "[t]o the extent that a specific word, phrase, sentence or paragraph involves such an allegation [based on information and belief], such allegations are based on the totality of the allegations contained in the Complaint." Comp.Gen. Comm't A. In addition to its disturbing circularity, this method of pleading surely lacks the kind of specificity required by Rule 9(b), *see, e.g., Romani,* 929 F.2d at 878, let alone the "more rigorous" standards of the PSLRA, *see, e.g., Friedberg v. Discreet Logic, Inc.,* 959 F.Supp. 42, 46 (D.Mass.1997) (Harrington, J.). While few courts have addressed section 78u–4(b)(1) in any significant depth, "clearly Congress intended courts to take seriously the requirement that a plaintiff plead with particularity all facts upon which the plaintiff is basing the information and beliefs contained in the plaintiff's allegations." *Malin v. Ivax,* 17 F.Supp.2d 1345, 1998 WL 519595, at *13 (S.D.Fla. Aug.18, 1998). Surely plain-

---

7. The allegation in paragraph 61 also fails to identify the speaker because it refers to "Ingari and/or Deysher." Comp. ¶ 61. A complaint does not sufficiently identify the speaker of an allegedly misleading statement if it refers to a defendant in an "and/or" manner. *See Brinker Capital v.*

*Imagex Servs., Inc.,* 178 F.R.D. 380, 384 (N.D.N.Y.1998); *see·also Zuckerman v. Foxmeyer Health Corp.,* 4 F.Supp.2d 618, 622 (N.D.Tex. 1998); *In re Silicon Graphics, Inc. Sec. Litig.,* 970 F.Supp. 746, 752 (N.D.Cal.1997).

tiffs cannot simply predicate their beliefs on other allegations that themselves are based solely on information and belief.

The only allegations of fraud based on something other than information and belief relate to the alleged omission in paragraph 83 of the Complaint regarding the Power-burst/LanRover technology merger. This paragraph nonetheless fails to meet the strictures of the PSLRA, which requires plaintiffs to set forth "each statement alleged to have been misleading...." 15 U.S.C. § 78u–4(b)(1). In addition, Lirette has not identified the speaker of any allegedly misleading statements or where and when each was made. *See* Comp. ¶ 83. Lirette's reliance on "a series of strategic disclosures to the media as well as formal press releases" during an eleven day period does not answer sufficiently the who, what, where, and when inquiries posed by Rule 9(b) and the PSLRA. Such generalized pleading is particularly suspect given that, elsewhere in the Complaint, Lirette quotes at length from specific statements made by defendants Ingari and Deysher in specific press releases or conversations. *See* Comp. ¶¶ 59, 74, 76, 86.

Because Lirette has not provided any explanation as to why the statements in paragraph 74 are false, has not explained adequately the basis for his belief that the statements in paragraphs 59, 61, 76, and 86 were false, and has not stated the content, time, place, or speaker of the statements in paragraph 83, the Complaint must be dismissed as to all of these statements.

### (b) Statements Made in SEC Filings

The Complaint alleges that the defendants put forth the following five fraudulent misrepresentations and omissions in financial statements and accompanying statements to the SEC:

- On September 27, 1996, Shiva stated in its Form S–8 filed with the SEC: "Shiva provides most of its distributors and resellers with product return rights for stock balancing or product evaluation ... Stock balancing rights permit distributors to return products to Shiva for credit against future product purchases, within specified limits. Product evaluation rights permit end-users to return products to Shiva, through the distributor or reseller from whom such products were purchased, within 30 days of purchase if such end user is not fully satisfied ... Shiva believes that it has adequate reserves to cover product returns ..." Comp. ¶ 7, 105, 106.

- On or about November 13, 1996, Shiva stated in a Form 10–Q filed with the SEC: "Revenues increased by 90% to $57,109,000 for the three-month period ended September 28, 1996, from $30,033,000 in the comparable period in fiscal 1995. This increase was principally due to higher revenue from the Company's remote access products. Remote access product revenues increased by 144%, to $52,690,000 from $21,579,000 during the comparable period in fiscal 1995, principally due to higher revenues from the Company's LanRover(R) product family, including the LanRover Access Switch TM ..." *Id.* ¶ 65.

- On or about November 13, 1996, Shiva stated in a Form 10–Q filed with the SEC: "The Company provides its distributors and resellers with products return rights for stock balancing and product evaluations. Revenues were reduced by provisions for product returns of $3,326,000 and $2,013,000 in the three month period ended September 28, 1996 and September 30, 1995, respectively, representing 6% of gross revenues in each period." *Id.* ¶¶ 66, 107.

- On or about November 13, 1996, Shiva stated in a Form 10–Q filed with the SEC: "The accompanying unaudited consolidated financial statements include the accounts of the Company in accordance with generally accepted accounting principles. In the opinion of management, these unaudited consolidated financial statements contain all adjustments, consisting only of those of a normal recurring nature, necessary for a fair presentation of the Company's financial position, results of operations and cash flows at the dates and for the periods indicated. While the Company believes that the disclosures presented are adequate to make the information not misleading, these consolidated financial statements should be read in conjunction with the consolidated financial statements and related notes in-

cluded in the Company's Annual Report on Form 10–K for the fiscal year ended December 30, 1995 and in the Company's Registration Statement on Form S–3 dated August 23, 1996." *Id.* ¶ 67.

- During the class period, all of Shiva's financial statements were represented to have been prepared in accordance with GAAP. *Id.* ¶ 103.

■ These statements all relate to Lirette's contention that Shiva improperly recognized revenue in violation of GAAP[8] by granting resellers and distributors an unconditional right to return products. *See* Comp. ¶ 51(b). "To adequately plead financial fraud based on improper revenue recognition, Plaintiffs must allege, at a minimum, some particular transactions where revenues were improperly recorded, including the names of the customers, the terms of specific transactions, when the transactions occurred, and the approximate amount of the fraudulent transactions." *In re Oak Tech. Sec. Litig.*, No. 96–20552 SW, 1997 WL 448168, at *8 (N.D.Cal. July 1, 1997); *see also Gross*, 93 F.3d at 996 (dismissing allegations of revenue overstatement because plaintiff had not alleged the amount of the alleged overstatement or the net effect it had on the company's earnings); *Zeid v. Kimberley*, 973 F.Supp. 910, 923 (N.D.Cal.1997) (dismissing allegations of fraud based on defendant's liberal return policy because complaint did not set forth who had told the customers they could return the products if not sold, when the transactions occurred, or whether any of the products ultimately were returned).

According to the Complaint, Shiva told one of its resellers, SoluNet Inc., that it could return Shiva products at any time for any reason. *See* Comp. ¶ 51(b)(1). The Complaint also alleges that another reseller, Asyne Technologies, could return any unsold product. *See* Comp. ¶ 51(b)(2). The Complaint further alleges that Shiva accepted the return of, "or agreed to accept the return of," approximately $130,000 worth of product that

had been shipped to Omnitech Corporate Solutions in the fourth quarter of 1996. Comp. ¶ 51(d)(2).

Despite these details, Lirette fails to allege with requisite particularity that defendants committed financial statement fraud. First, he never alleges who at Shiva offered to accept unconditional returns from SoluNet and Async, and never alleges that anyone at Shiva extended this offer to Omnitech. Second, the Complaint is vague as to when these promises were made, using the terms "at all relevant times" with respect to SoluNet, "in or about the third or fourth quarter of 1996" with respect to Async, and no temporal designation with respect to Omnitech. Finally, Lirette never alleges that any Shiva customer actually returned any products. At best, the Complaint alleges that "Shiva has since [the fourth quarter of 1996] accepted the return of, *or agreed to accept the return of,* approximately $130,000 worth of product" from Omnitech. Comp. ¶ 51(d)(2) (emphasis added). Not only does this statement fail to allege that Omnitech actually returned the product, but it refers to a period of time that goes beyond the scope of the class period. Thus, even if Omnitech actually did return $130,000 worth of product—a fact not specifically alleged in the Complaint—the Complaint does not allege adequately that the return occurred during the class period. For these reasons, the Complaint fails sufficiently to allege financial statement fraud as required by the pleading standards of Rule 9(b), *see Gross*, 93 F.3d at 996, and the PSLRA, *see Zeid*, 973 F.Supp. at 923; *In re Oak Tech. Sec. Litig.*, 1997 WL 448168, at *8.

### (c) Statements to Securities Analysts

■ The Complaint further alleges that the defendants are liable for the following nine statements made by securities analysts who followed the company during the class period:

- On September 10, 1996, Cowen & Co. reported: "Management Sees A Robust Market Outlook. Management noted that its

---

8. Lirette cannot state a claim for securities fraud merely by alleging a GAAP violation; the complaint must also contain a statement of the defendants' fraudulent intent. *See Serabian v. Amoskeag Bank Shares, Inc.*, 24 F.3d 357, 362 (1st Cir. 1994); *Greebel v. FTP Software*, 182 F.R.D. 370, 374 (D.Mass.1998) (Tauro, C.J.). Lirette has not adequately pleaded the intent requirement. *See* section IV.B.2, *infra.*

remote access business had grown 145% Y/Y at Cowen's Fall Technology Conference. SHVA extensively discussed three distinct market segments, as well as other markets that it intends to pursue. The Enterprise LAN market is the heart of SHVA's current business and is served by the LanRover and Access Switch products. The company holds number one share in this market, and pricing, in the high hundreds of dollars per port is holding up nicely. The company is receiving a number of large corporate orders, shipping $1MM to $5MM to these enterprises over 4 to 8 quarters. Portions of these orders are for the high density Access Switch. Examples include: CNN, Fidelity, American Express, and NASDAQ. Our impression is that the heart of SHVA's market is particularly robust.... In response to a question, the company indicated that sales of the Access Switch were going well." Comp. ¶ 53.

- On September 26, 1996 Cowen & Co. reported: "SHVA Holds Bullish Analyst Meeting. Goal To Be First In Enterprise and Carrier Access. Building on its strong LanRover and exceptional initial showing for its Access Switch, the company believes it can maintain its leadership position in Enterprise and Corporate remote access (with its LanRover and Access Switch products) and become the number one player in telco access solutions by incorporating the Access Switch in Nortel's Rapport and its Internet Thruway solutions. Market researchers suggest that the markets served by SHVA may total $4.7B by the year 2000. Management seemed extremely confident. SHVA described a range of client and management software products as well as virtual private networking capabilities that position the company for strong growth going forward." *Id.* ¶ 55.

- On October 18, 1996 Cowen & Co. reported: "Raising F97 est after strong Q3. Sales ( [up] 11% Q/Q) in line. Remote access [up] 21% Q/Q, LanRover sales outside OEM channel [up] 19% (vs 6) a penny higher than est ... Co. expects robust growth, raised oper margin guidance. Target $60. SHVA $44—Stix." *Id.* ¶ 63.

- On or about October 18, 1996, Robertson Stephens reported: "Shiva posted solid quarter-over-quarter and year-over-year revenue growth ... The upside earnings surprise was driven by strong sales throughout the company's core remote access product line. Non–OEM channels contributed particular strength, accounting for 19% sequential growth and 78% of total sales. The company also noted that its LanRover Access Switch, which was first introduced in the second quarter, continues to enjoy sales momentum." *Id.* ¶ 64.

- On or about December 18, 1996 Dillon Read reported: "Despite a stock downturn in July 1996 from a 52 week high of $87, there has been nothing but fundamental good news from Shiva. The stumble earlier this year was due in part to over exaggerated concerns (in our view) over the competitive landscape in remote access. Shiva is very well positioned to grab a meaningful share of this extremely hot growth market. The firm has an excellent reputation in the enterprise side of the market and that reputation should carry forward, as witnessed by the early success of the LanRover Access Switch.... Given the firm's strong position and reputation in the enterprise remote access market, the initial strength of its LanRover Access Switch product, its robust fundamentals, and the leverage from its Nortel Alliance, we feel that the firm can maintain a multiple of approximately 35–40x earning going forward." *Id.* ¶ 68.

- On January 8, 1997, Cowen & Co. reported: "[C]ompany guidance calls for flat revenues in Q1:C97 followed by robust growth." *Id.* ¶ 80.

- On or about January 24, 1997, Robertson Stephens reported: "The earnings disappointment was primarily due to channel inventory that was built during the June and September quarters. Management estimates that the company had as much as 13 weeks of inventory. The rest of the shortfall came from unexpected softness in IBM orders, as IBM has also built inventory." *Id.* ¶ 85.

- On or about January 24, 1997, Cowen & Co. reported: "[B]ased on sales of the Ac-

cess Switch, both through channels and OEMs, IBM and Nortel, the company expects a significant turnaround later in C97." *Id.* ¶ 89.

- On or about March 14, 1997, Dillon Read reported: "The fact that the company still feels that the previous 1997 EPS consensus estimate of $1.06 is still within reach and that a final resolution of the Nortel agreement seems imminent reconfirm to us that the worst should surely be behind Shiva. However, we are reminded by management that this quarter should be 'flattish' with 4Q results and that the benefits of being involved in the stock should soon become apparent in the quarters to come." *Id.* ¶ 90.

■ This Circuit has not yet decided whether a defendant company may be held liable for statements in an analyst's report. *See Suna,* 107 F.3d at 73. Even assuming, however, that an analyst's statements could be attributed to a company, any allegation that the company made misrepresentations to the analyst must survive the Rule 9(b) standard. *See id.; In re Boston Tech. Inc. Sec. Litig.,* 8 F.Supp.2d 43, 55 (D.Mass.1998) (Lasker, J.). Thus, a plaintiff must allege with particularity the time, place, content and speaker of the company's communications with the analysts, and explain why the communications were fraudulent. *See Suna,* 107 F.3d at 73; *In re Boston Tech. Sec. Litig.,* 8 F.Supp.2d at 55. In addition, as with any claim of securities fraud, the plaintiff must allege facts giving rise to a "strong inference" of fraudulent intent. *See* 15 U.S.C. § 78u–4(b)(2); *Maldonado,* 137 F.3d at 9 n. 5; *In re Boston Tech. Sec. Litig.,* 8 F.Supp.2d at 55.

None of the analysts' report statements in the Complaint meet the applicable pleading standards because the Complaint fails to specify the time, place, and speaker of the statements. The statements in paragraphs 64, 85, and 89 fail to attribute the statements to any person at Shiva. *See* Comp. ¶¶ 64, 85, 89. The statements in paragraphs 53, 55, 63, 69, 80, and 90 are attributed to "Ingari and/or Deysher." *See id.* ¶¶ 53, 55, 63, 69, 80, 90. This method of pleading does not sufficiently identify the person who made the allegedly misleading statement, and thus does not meet the pleading standard in the securities context. *See Zuckerman v. Foxmeyer Health Corp.,* 4 F.Supp.2d 618, 622 (N.D.Tex.1998); *Brinker Capital Holdings, Inc. v. Imagex Servs. Inc.,* 178 F.R.D. 380, 384 (N.D.N.Y.1998); *In re Silicon Graphics Inc. Sec. Litig.,* 970 F.Supp. 746, 752 (N.D.Cal.1997).

In addition, paragraphs 64, 85, and 89 make no allegation as to when and where these statements were made to analysts. *See id.* ¶¶ 64, 85, 89. As to the remaining statements, Lirette alleges only that these statements "were of a nature that could only have been provided (or be based on specific information provided) by the Company and its senior management." *Id.* ¶¶ 56, 63, 69, 80. Such general allegations of time and place do not pass the Rule 9(b) test. *See In re Boston Tech. Sec. Litig.,* 8 F.Supp.2d at 59.

Furthermore, the Complaint does not adequately allege why the statements made to analysts were false. In fact, the Complaint fails to allege that most of these statements were even false at all. *See* Comp. ¶¶ 63, 64, 69, 80, 85. As to the remaining statements, all allegations as to why they were false are based solely on information and belief. *See id.* ¶¶ 56, 90. Such allegations do not fulfill the pleading standards of Rule 9(b), *see Romani,* 929 F.2d at 878, or the PSLRA, *see* 15 U.S.C. § 78u–4(b)(1).

Thus, even assuming that this Circuit recognizes liability for fraudulent statements found in the reports of securities analysts, this Complaint fails to allege with the proper particularity that such liability can be found in this case. Consequently, the defendants' motion to dismiss is granted as to these statements.

### 2. Scienter

■ A securities fraud plaintiff must show not only that a defendant made false or misleading statements or omissions, but also that the defendant acted with scienter. *See Shaw v. Digital Equip. Corp.,* 82 F.3d 1194, 1217 (1st Cir.1996). The requisite scienter in a securities fraud case is the "mental state

embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). Under the PSLRA, in order to meet the scienter requirement in a securities fraud case, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). The First Circuit already required this much of plaintiffs in its pre-PSLRA cases. *See Maldonado*, 137 F.3d at 8, 9 & n. 5; *Suna*, 107 F.3d at 68. *See also Diana Paolucci Corp. v. Carbonell & Astor*, 949 F.Supp. 65, 71 (D.P.R.1996).

 Since the passage of the PSLRA, the district courts have debated exactly what constitutes a "strong inference." *See Malin*, 17 F.Supp.2d 1345, 1352-57 (examining the contrary views taken by courts). The core of the debate is whether Congress intended to codify the Second Circuit's definition of "strong inference," *see, e.g., Marksman Partners v. Chantal Pharmaceutical Corp.*, 927 F.Supp. 1297, 1309–10 (C.D.Cal.1996), or whether Congress wanted to impose an even stronger requirement, *see, e.g., Friedberg*, 959 F.Supp. at 48–50.

Before the PSLRA, the Second Circuit recognized two ways in which a plaintiff could plead scienter. First, a plaintiff could "allege facts establishing a motive to commit fraud and an opportunity to do so." *In re Time Warner Sec. Litig.*, 9 F.3d 259, 269 (2d Cir.1993). Second, a plaintiff could "allege facts constituting circumstantial evidence of either reckless or conscious behavior" from which scienter could be inferred. *Id.* Courts ruling that Congress intended to codify the Second Circuit standard permit a plaintiff to plead scienter by **either** of these two methods. *See, e.g., City of Painesville v. First Montauk Fin. Corp.*, 178 F.R.D. 180, 187 (N.D.Oh.1998); *Rehm v. Eagle Fin. Corp.*, 954 F.Supp. 1246, 1252 (N.D.Ill.1997); *Marksman Partners*, 927 F.Supp. at 1309–10. Courts ruling that Congress intended to raise the Second Circuit standard have held that "motive and opportunity" does not fulfill the scienter requirement under the PSLRA. *See, e.g., Novak v. Kasaks*, 997 F.Supp. 425, 430 (S.D.N.Y.1998); *Norwood Venture Corp.*

*v. Converse Inc.*, 959 F.Supp. 205, 208 (S.D.N.Y.1997). In addition, courts adhering to the latter view dispute whether a plaintiff can adduce circumstantial evidence of either reckless *or* conscious behavior, *see, e.g., Malin* 17 F.Supp.2d at 1345, 1998 WL 519595, at *10; *In re Stratosphere Corp. Sec. Litig.*, 1 F.Supp.2d 1096, 1107 (D.Nev.1998); *In re Baesa Sec. Litig.*, 969 F.Supp. 238, 241 (S.D.N.Y.1997), or whether conscious behavior alone fulfills the PSLRA standard, *see, e.g., Voit v. Wonderware Corp.*, 977 F.Supp. 363, 374 (E.D.Pa.1997); *Norwood*, 959 F.Supp. at 208; *Friedberg*, 959 F.Supp. at 49–50.

This Court joins those that have ruled "motive and opportunity" to be an inadequate method for pleading scienter in a securities fraud case under the PSLRA. In a pre-PSLRA case, this Circuit expressed doubt that "motive and opportunity" could fulfill "this circuit's 'especially rigorous' application of Rule 9(b) in the securities fraud context," and refused to adopt that standard. *Maldonado*, 137 F.3d at 10, n. 6.

 The legislative history of the PSLRA makes clear that Congress did not intend to adopt the Second Circuit standard in full. The Conference Committee Report plainly states that "[b]ecause the Conference Committee intends to strengthen existing pleading requirements, it does not intend to codify the Second Circuit's case law interpreting this pleading standard." H.R.Conf. Rep. No. 369, 104th Cong., 1st Sess. 41 (1995). The report went on to state that "[f]or this reason, the Conference Report chose not to include in the pleading standard certain language relating to motive, opportunity, or recklessness." *Id.* Moreover, the Conference Committee rejected a Senate Bill with an amendment filed by Senator Specter that explicitly adopted the Second Circuit standard. *See* Amend.1985 § 240, 104th Cong., 1st Sess. (1995). " 'Few principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language.' " *Immigration & Naturalization Serv. v. Cardoza–Fonseca*, 480 U.S. 421, 442–43, 107 S.Ct. 1207, 94 L.Ed.2d 434

(1987) (citations omitted). The decision of Congress to reject the Senate Bill and the Specter Amendment "strongly militates against a judgment that Congress intended a result that it expressly declined to enact." *Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186, 200, 95 S.Ct. 392, 42 L.Ed.2d 378 (1974); *see also Friedberg*, 959 F.Supp. at 49.

 As to "reckless" versus "conscious" behavior, this Court declines to follow the path taken by Judge Harrington in *Friedberg*, and holds instead that a plaintiff may plead scienter with circumstantial evidence of conscious *or* reckless behavior. Section 78u–4(b)(2) does not purport to change the substantive law of securities fraud. Rather, it mandates a more stringent pleading standard; complaints must evince "a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2).

 The required state of mind is a matter of substantive law. *See Malin*, 17 F.Supp.2d at 1357. The Supreme Court held in 1976 that scienter is a necessary element of a claim under section 10(b). *See Ernst & Ernst*, 425 U.S. at 193, 96 S.Ct. 1375. While the Court declined to address explicitly whether recklessness fulfills the scienter requirement in a section 10(b) action, the circuit courts of appeals have been nearly unanimous in ruling that it does. *See Van Dyke v. Coburn Enters.*, 873 F.2d 1094, 1100 (8th cir.1989) (adopting recklessness as a basis for section 10[b] liability and noting that the Second, Third, Fifth, Seventh, Ninth, Eleventh, and D.C. Circuits had already done so). The First Circuit has assumed "without deciding that reckless conduct can result in a § 10(b) liability,...." *Cook v. Avien, Inc.*, 573 F.2d 685, 692 (1st Cir.1978); *see also In re Biogen Sec. Litig.*, 179 F.R.D. 25, 35 (D.Mass.1997) (Saris, J.). Therefore, this Court will continue to entertain allegations of recklessness, so long as they conform to the

"strong inference" pleading requirement of the PSLRA.

 Lirette contends that the defendants engaged in a fraudulent course of business, including channel stuffing, in order to hide serious problems within the company, particularly the decreasing demand for LanRover products. Thus, the key inquiry is whether the Complaint sufficiently alleges whether the defendants **knew** that these problems existed. "Even if plaintiffs wish to prove scienter by 'recklessness,' they still must allege, with sufficient particularity, that defendants had full knowledge of the dangers of their course of action and chose not to disclose those dangers to investors." *Maldonado*, 137 F.3d at 9 n. 4. Pleadings of scienter " 'may not rest on a bare inference that a defendant must have had knowledge of the facts.' " *Id.* at 9 (quoting *Greenstone*, 975 F.2d at 26) (internal quotations omitted).

The Complaint alleges that defendants knew or recklessly disregarded the following facts:

- Shiva's business was not performing as well as the defendants publicly represented
- Shiva was plagued by serious problems with its sales and marketing efforts
- Demand for Shiva's products was weakening
- The technological capabilities of Shiva's products were increasingly unattractive in comparison to competitors' products
- Shiva's competitive position was eroding.

*See* Comp. ¶ 45. As Lirette concedes, however, every allegation that the defendants knew about these problems, that they acted in response to these problems, and that they engaged in fraudulent conduct to conceal these problems is based solely on information and belief.[9] *See id.* ¶¶ 5 n. 8, 6 n. 22. Such allegations do not support a "strong inference" of the required state of mind. *See*

---

9. According to the Complaint, "[a]llegations that defendants acted with scienter are based on inferences based on, *inter alia*, the materiality of the improper revenue recognition and channel stuffing practices alleged in the Complaint, the combination of the practices alleged, and the corporate-policy nature of certain of those practices (*e.g.*, the corporate-policy nature of any

decision to offer a diverse group of distributors broad product return rights, or to threaten distributors with termination of their direct dealer status)." Comp.Gen.Comm. G. (citation omitted). One hardly could consider these bases "facts," and certainly could not consider them *particularized* facts.

*Maldonado,* 137 F.3d at 9; *Luce v. Edelstein,* 802 F.2d 49, 54 n. 1 (2d Cir.1986) ("To satisfy Rule 9(b) [with respect to matters particularly within the opposing party's knowledge], the allegations must be accompanied by a statement of facts upon which the belief is founded."), *cited in Greenstone,* 975 F.2d at 25.

■■■■ The only allegations supported by some document or statement on personal knowledge, rather than by information and belief, relate to defendant Cole's sale of 50,-000 shares of Shiva stock during the class period. *See* Comp. ¶ 123. Allegations of unusual insider trading by a defendant during the class period can support a strong inference of scienter. *See Serabian,* at 368 (1st Cir.1994). Lirette, however, bears the burden of showing that sales by insiders were in fact unusual or suspicious in amount or timing. *See In re Glenayre Tech., Inc. Sec. Litig.,* 982 F.Supp. 294, 298–99 (S.D.N.Y. 1997). One fact necessary to a showing of unusualness is the amount of trading that the insider conducted before or after the class period. *See Greebel v. FTP Software, Inc.,* 182 F.R.D. 370 (D.Mass.1998) (holding that evidence of insider trading, without reference to the amount of insider trading normally conducted, fails to imply scienter); *In re Chipcom Corp. Sec. Litig.,* No. 95–11114, 1996 WL 1057531, slip. op. at 36 (D.Mass. Apr. 29, 1996) (Woodlock, J.) (same). Lirette's Complaint fails to set forth the amount of trading Cole conducted before or after the class period, or, for that matter, any other fact that might support a finding of unusualness. Thus, Lirette's allegations about Cole's trades do not support a strong inference of scienter. *See Greebel,* 182 F.R.D. 370, ——; *Chipcom,* No. 95–11114, 1996 WL 1057531, slip. op. at 36.[10]

■■■■ Lirette's attempts to plead scienter by asserting that Ingari and Deysher "were privy to confidential proprietary information concerning the Company and its operations, finances, financial condition, products and business prospects" also must fail. Comp. ¶ 20. General allusions to unspecified internal corporate information are insufficient to withstand a motion to dismiss. *See Gross,* 93 F.3d at 993–94; *Serabian,* 24 F.3d at 365–66; *Zeid,* 973 F.Supp. at 924–25 (ruling that allegations of access to internal documents by executives do not amount to contemporaneous facts showing that defendants knew their misleading statements were false when made and thus are insufficient under the PSLRA). Lirette has not directed the Court to any particular documents drafted by, or available to, the defendants that would indicate the defendants' knowledge of Shiva's problems.

Thus, Lirette's allegations of scienter consist solely of general inferences that the defendants, by virtue of their position within the company, "must have known" about the company's problems when they undertook allegedly fraudulent actions. "Unfortunately for the plaintiffs, these are precisely the types of inferences which this court, on numerous occasions, has determined to be inadequate" to withstand the special pleading requirements in securities fraud cases. *Maldonado,* 137 F.3d at 9. The Complaint must therefore be dismissed.

### III. Conclusion

■■■ "[T]he securities laws 'do not guarantee sound business practices and do not protect investors against reverses.' " *Serabian,* 24 F.3d at 361 (quoting *DiLeo v. Ernst & Young,* 901 F.2d 624, 627 [(7th Cir.1990)] ). Rather, the securities laws protect investors from fraud that has been perpetrated knowingly or, at the very least, recklessly. Lirette's Complaint, long on words yet short on facts, does not allege with sufficient particularity that any fraud occurred and, moreover, does not allege that the defendants had the

---

**10.** Plaintiffs also allege that Ingari and Deysher, as well as five unnamed Shiva officers, sold shares of Shiva stock in the first and second quarters of 1996. *See* Comp. ¶ 124. However, as these sales took place outside the class period, they do not support a strong inference of scienter. *See Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 54 (2d Cir.1995) (finding that "[u]nusual insider trading activity *during the class period* may permit an inference of bad faith and scienter,...") (emphasis added). In fact, evidence that officers sold shares prior to the class period can undermine a plaintiff's claim that insider sales during the class period were unusual. *See In re Glenayre,* 982 F.Supp. at 299.

requisite state of mind to commit fraud. This Circuit takes very seriously the pleading requirements set forth by Rule 9(b), *see, e.g., Romani*, 929 F.2d at 878, and now must adhere to the latest mandate by Congress, *see* 15 U.S.C. § 78u–4(b)(3)(A). This Court must implement these standards.

In sum, while there is no doubt that Lirette lost money on his investment in Shiva, and indeed may well have been defrauded, he cannot prove it—at least, not without extensive discovery. The price of that discovery is, as Congress has required, a complaint more fact-specific and detailed than Lirette and other investors can pay. Thus, no citizen jury will ever evaluate these claims, as this complaint must be, and hereby is, dismissed.