**In re PLC SYSTEMS, INC. SECURITIES LITIGATION.**

**No. Civ.A. 97–11737–RGS.**

United States District Court,
D. Massachusetts.

March 26, 1999.

*MEMORANDUM AND ORDER ON DEFENDANTS' MOTION TO DISMISS*

STEARNS, District Judge.

This class action was brought on behalf of investors who purchased PLC Systems, Inc. (PLC) common stock and options between August 15, 1996, and July 25, 1997.

PLC's principal product is The Heart Laser, an alternative to angioplasty and coronary bypass surgery. The Consolidated Amended Class Action Complaint (Amended Complaint) alleges that PLC artificially inflated the price of its common stock by issuing press releases misrepresenting the clinical and regulatory progress of The Heart Laser during its development phase, in violation of sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 and Securities and Exchange Commission (SEC) Rule 10b–5 (17 C.F.R. § 240.10b–5). Defendants move to dismiss the Amended Complaint arguing that plaintiffs have failed to particularize their allegations of fraud. Defendants also maintain that PLC's press releases are sheltered by the "safe harbor" provision of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u–4.

## THE AMENDED COMPLAINT

The facts alleged in the Amended Complaint are for present purposes deemed to be true. The class of plaintiffs consists of purchasers of PLC stock or those who purchased call options or sold put options during the period August 15, 1996, through July 25, 1997. Defendant PLC is a Canadian corporation. Defendant Max Hibbs is PLC's Chief Executive Officer. Defendant Dr. Robert Rudko is PLC's President and the Chairman of its Board of Directors.

The Heart Laser is a medical device that enables a surgeon to punch holes into the left ventricle of the heart muscle in a procedure called Transmyocardial Revascularization (TMR). The external surface of the hole heals, but the perforation remains open inside the ventricle, thereby improving the flow of blood to the heart. The plaintiffs' claims are based upon a series of PLC press releases chronicling the progress of a clinical study (Controlled Study) of The Heart Laser ordered by the Food and Drug Administration (FDA). The releases are set out in stupefying but necessary detail in the pages that follow. The occasional underlining in the text was added by the plaintiffs in the Amended Complaint. Each of the contested press releases has been designated with a Roman numeral to make the later discussion easier to reference.

### I

On August 15, 1996, PLC issued the first of the challenged press releases.

*Average Angina Levels in TMR Group Reduced to 1.7 from 3.7 Mortality Rate in TMR Group is 63% Lower Than in Medical Therapy Group*

Milford, Mass. Aug. 15/PRNewswire /— PLC Systems Inc. (AMEX:PLC) today announced the six month results of a 100 patient controlled, randomized study comparing Transmyocardial Revascularization (TMR) using the highpowered $CO_2$ Heart Laser to medical therapy.

\* \* \* \* \* \*

In reviewing the clinical data at six months follow-up it was found that 71% of the TMR patients demonstrated a decrease of at least two angina classes whereas all patients within the medical therapy group either remained the same or their condition worsened. The results were as follows: pre-op the TMR group registered an average angina class of 3.7 (0 is best, 4 is worst). Six months after the procedure, the TMR group registered an average angina class of 1.7. In comparison, before entering the study the medical therapy group registered an angina class of 3.55 and six months later, registered an increase in average angina class to 3.9. In addition, two standard medical angina questionnaires shows that patients' overall health improved following the TMR procedure while it either remained unchanged or worsened in the control group.

The study also provided a direct comparison of the mortality rate associated with TMR and medical therapy. *The mortality in the TMR group was 1% during the preoperative period (up to 30*

days following the procedure) and 5% at the follow-up, resulting in an overall TMR mortality of 6%. In contrast, the mortality rate in the medical therapy control group was 16%. Overall, the mortality rate in the TMR group was 63% lower than the mortality rate in the medical therapy group.

In summary, the results show that TMR using The Heart Laser significantly improved overall patient clinical status. At the same time, the mortality profile associated with the TMR procedure was an improvement as compared to the mortality profile of the control group. TMR using The Heart Laser, therefore, may offer new opportunities for patients who previously had no option beyond being condemned to a very poor quality of life.

"The significant differences in the clinical outcomes between the TMR group and the medical therapy group demonstrate that medical therapy, as the only current remedy, is a failure as a treatment for patients with end-stage coronary artery disease," stated M. Lee Hibbs, President and CEO of PLC Systems, Inc. "The TMR data, as collected with the CO2 Heart Laser, confirms that TMR may be an effective therapy for this patient group and PLC Systems hopes TMR will one day be utilized as a treatment for the various stages of coronary artery disease. The data from this study, as well as the one year follow-up data from a 201 patient TMR study using The Heart Laser were part of a recent follow-up submission to the Food and Drug Administration (FDA) and the Company believes this data will satisfy the FDA's request for premarket data."

Amended Complaint ¶ 46. Plaintiffs contend that this release misrepresented the mortality benefits of TMR and omitted material details about the design of the clinical trial.

## II

On September 10, 1996, PLC issued the following press release:

Patients Previously Randomized to Medical Management Can Be Crossed–Over to TMR after 12 Months

FRANKLIN, Mass., Sept. 10/PRNewswire/— PLC Systems Inc. (AMEX:PLC) today announced that the Food and Drug Administration (FDA) has notified the Company that it can halt the randomization of patients to the medical management group in a study comparing patients who receive Transmyocardial Revascularization (TMR) using the Company's CO2 Heart Laser to medical therapy. In addition, those patients previously randomized to the medical management group may then receive TMR using The Heart Laser after 12 months follow-up.

"Due to the dramatic differences in the clinical outcomes between the TMR group and the medical therapy group the FDA has allowed PLC Systems to stop randomizing patients to medical management at centers which are performing TMR using The Heart Laser. The principal investigators at each hospital center have been notified of this recent development," stated M. Lee Hibbs, President and CEO of PLC Systems, Inc. "Moreover, the patient outcome data shows medical management to be ineffective, and supports the use of TMR using The Heart Laser as a replacement for medical/drug therapy in end-stage coronary artery disease patients."

Results of a controlled, randomized study comparing patients who receive TMR using the CO2 Heart Laser to medical management demonstrated that 71% of the TMR patients recorded a decrease of at least two angina classes, whereas all patients within the medical therapy group either remained the same or their condition worsened. This study also provided a direct comparison of the mortality rates associated with TMR and medical therapy. The overall mortality in the TMR group was 6%. In

*contrast, the mortality rate in the medical management group was 16%.*

Amended Complaint ¶ 48. Plaintiffs allege that this release exaggerated the mortality benefit of TMR and misrepresented the significance of the FDA's action.

### III

On October 23, 1996, PLC issued a press release in connection with its third quarter financial results.

Commenting on the Company's progress at the Food and Drug Administration, Robert Rudko, Chairman and Chief Scientific officer of PLC Systems, Inc. stated, "PLC Systems submitted pivotal clinical data on TMR using The Heart Laser to the FDA this past summer. *Upon reviewing the data, we believe the FDA found that the patients treated with TMR using The Heart Laser faired [sic] much better than patients in the control group. As a result, the FDA allowed the Company to stop randomizing patients to medical therapy,* the current standard of care in the patient group, thus allowing all patients to be treated with The Heart Laser. *PLC Systems believes this is the first time the FDA has halted the randomization of a clinical trial for a medical product.* The FDA also found that the data was sufficient so as to not warrant any new clinical studies for TMR using The Heart Laser for the indication of inoperable coronary artery disease. PLC Systems is in the process of summarizing both the phase II and the phase III studies for the FDA. This information will be submitted shortly. It is the Company's expectation that once the FDA has the opportunity to review this information, an eventual panel meeting date will be set to evaluate TMR using The Heart Laser."

Amended Complaint ¶ 51. Plaintiffs contend that this release misrepresented the significance of the FDA's action.

### IV

On December 4, 1996, PLC issued the following press release.

*Company is approved to Treat 300 Patients at 20 Sites in End–Stage CAD Study*

FRANKLIN, Mass., Dec. 4/PRNewswire/—PLC SYSTEMS INC. (AMEX:PLC) today announced that the U.S. Food and Drug Administration (FDA) has given the Company approval to expand its multi center clinical study of Transmyocardial Revascularization (TMR) using The Heart Laser (TM) as sole therapy for end-stage coronary artery disease to 300 patients at 20 sites.

\* \* \* \* \* \*

As a result of the growth in demand for the procedure by patients, PLC Systems petitioned the FDA for additional clinical sites and an increase in the number of patients who could be treated with TMR using The Heart Laser under the sole therapy Investigational Device Exemption (IDE). The FDA complied with this request. . . .

"PLC Systems views this news from the FDA as very positive. Although patient enrollment has been completed for the sole therapy study and the clinical data has been submitted to the FDA for this indication, the FDA is now allowing additional sites to join and more patients to be treated with TMR using The Heart Laser," stated M. Lee Hibbs, President and CEO of PLC Systems. "The Company recently submitted additional follow-up data on both the Phase II and Phase III patients enrolled in The Heart Laser clinical studies, and we expect this data to satisfy FDA requests for clinical information."

Amended Complaint ¶ 53. Again, plaintiffs contend that the release misrepresented the significance of the FDA's action.

### V

On February 13, 1997, PLC issued the following release.

"Based on discussions with the Food and Drug Administration, PLC Systems' management believes its PMA application for The Heart Laser is on track for approval this year. All of the data collected on TMR using The Heart Laser continues to support the procedure as a potential treatment for patients with coronary artery disease, and we are working closely with the FDA to attain final approval of The Heart Laser," commented M. Lee Hibbs.

Amended Complaint ¶ 55. Plaintiffs allege that the release omitted material information about the clinical trial and misrepresented the prospects of FDA approval of The Heart Laser.

## VI

On February 26, 1997, PLC issued the following press release.

M. Lee Hibbs, President and CEO of PLC systems, Inc., stated, "The filing of our application is a major milestone achievement in the FDA review process. The fact that expedited review has been granted should intensify the FDA's activity and may compress the remaining process time." Mr. Hibbs continued, "After seven years of development and clinical testing of The Heart Laser in the treatment of coronary artery disease, PLC Systems has entered what we believe is the final stage of a definitive process toward FDA approval. We believe the recent filing of the PMA application for the Company's CO2 Heart Laser allows PLC Systems to remain on track for an FDA approval this year, establishing a long, solid U.S. lead time for The Heart Laser over any competing technologies."

Mr. Hibbs concluded, "The clinical results of TMR using The Heart Laser in late stage coronary artery disease patients have been published in major cardiovascular journals as well as presented at several scientific meetings. The results have demonstrated reductions in chest pain, statistically significant increases in perfusion and improvements in patient quality of life. We believe The Heart Laser has the potential to be a leading device in the treatment of heart disease. It is the Company's expectation that TMR using The Heart Laser will be rapidly accepted as a standard of care for late-stage coronary artery disease patients as well as evaluated and used as an adjunct to the approximate 675,000 cardiac bypass surgeries performed worldwide."

Amended Complaint ¶ 57. Plaintiffs contend that this release exaggerated the perfusion[1] findings and misrepresented the prospects of FDA approval of The Heart Laser.

## VII

A March 19, 1997 PLC press release reported the results of a presentation of the findings of the Controlled Study to a meeting of the American College of Cardiology.

The data demonstrated statistically significant decreases in angina and marked improvement in the quality of life in patients treated with TMR versus those continued on drug therapy.

Overall, 71% of the TMR patients showed significant decreases in angina while no patients in the drug therapy group showed improvement. The average quality of life index increased 127% in the TMR group, while it remained unchanged (+1%) in the drug therapy group. Researchers concluded "the clinical data supports the recommendation of TMR (with The Heart Laser) for patients with medically refractory angina."

Amended Complaint ¶ 59. Plaintiffs allege that the release omitted aspects of the presentation that were critical of the therapeutic benefits of TMR.

---

1. Perfusion is the act of "forcing blood or other fluid to flow from the artery through the vascular bed of a tissue." *Stedman's Medical Dictionary* 1325 (26th ed.1995).

## VIII

On April 22, 1997, PLC attributed the following statement to Dr. Rudko.

"The Company is on track for Food and Drug Administration (FDA) approval and we expect that full approval could be granted in the summer months. There is a great deal of excitement for TMR in the medical community with an estimated market potential of more than $1 billion. Goldman Sachs is helping the Company to identify strategic partners who would assist PLC Systems in reaching the broadest audience, both domestically and abroad, for its products."

Amended Complaint ¶ 61. Plaintiffs allege that the statement that FDA approval could come as early as the summer of 1997 had no basis in fact.

## IX

On April 30, 1997, PLC issued the following press release.

PLC Systems Inc. (AMEX: PLC) today announced the long term results of its clinical studies evaluating Transmyocardial Revascularization (TMR) using the Company's high-powered CO2 heart laser compared to medical therapy (the control group). This data has been submitted to the Food and Drug Administration (FDA) as a post-filing PreMarket Approval (PMA) submission in preparation for an expected FDA Advisory Panel meeting.

The effectiveness of the TMR treatment was assessed based on the changes observed in myocardial perfusion (blood flow into the heart muscle) and angina (chest pain).

Dr. Robert Rudko, Chairman of PLC Systems Inc., stated, "The clinical findings for TMR using The Heart Laser (TM) continue to be very impressive. Statistical significance has been demonstrated at 3, 6 and 12 months follow-up using thallium 201 testing and angina classification. We expect that the data collected will support a Food and Drug

Administration approval for The Heart Laser sometime this summer."

One of the most objective indications of the success of the TMR procedure is through thallium [sic] 201 testing (nuclear perfusion studies) which measure myocardial perfusion, or blood flow into the heart muscle. The improvement in myocardial perfusion in the treated patients at 12 months post-op was statistically significant with a less than 0.1% probability of this improvement occurring by chance (p≤(sic)9.991). Moreover, the change in myocardial perfusion observed between the treated group and the control group was also statistically significant. The reductions in angina observed in the TMR patients can be correlated with the statistically significant increases in myocardial perfusion. "The evidence of increased myocardial perfusion is extremely important in supporting the potential effectiveness of the TMR procedure," continued Dr. Rudko. "The correlation between the reduction in angina and the increase in perfusion supports the theory that the clinical benefit demonstrated in these studies is the result of restored blood flow to the ischemic, or oxygen starved areas of the heart. To date, TMR using The Heart Laser is the only product to demonstrate increased myocardial perfusion in clinical testing." Angina severity was measured using the Canadian Cardiovascular Society 0 to 4 classification scheme. From a clinical standpoint, the angina severity is considered to have significantly changed when the change is a decrease of at least two classes.

At least available follow-up, approximately 70% of the 300 patients treated with TMR using The Heart Laser experienced a clinically significant decrease in angina post-op. In contrast, only 6% of the patients in the control group showed a clinical improvement in angina status. the difference in success rates between the two groups was highly significant with a less than 0.1% probability

of this event occurring by change (p<0.001).

Dr. Rudko concluded, "In addition to angina status, data was collected with respect to the event free survival of the two groups. an event was registered as death, heart attack or unstable/class IV angina. More than 70% of the treated group remained event free for the 12 months following the TMR procedure whereas, less than 10% of the patients in the control group remained event free over a 12 month period."

Amended Complaint ¶ 63. Plaintiffs contend that the release failed to disclose statistical flaws in the reported data.

## X

On May 19, 1997, PLC issued this press release.

PLC Systems, Inc., (AMEX:PLC) today announced that its wholly-owned subsidiary PLC Medical Systems, Inc. has been informed by the Food and Drug Administration (FDA) reviewer of The Heart Laser (TM) TMR System that the advisory panel meeting for circulatory system devices has been scheduled for July 28th and 29th. The meeting had previously been scheduled for June. The FDA reviewer also informed the Company that TMR using The Heart Laser System is expected to be reviewed at the advisory panel meeting.

Dr. Robert Rudko, Chairman of PLC Systems, Inc., stated, "We are very excited about presenting the clinical results of The Heart Laser TMR system at the scheduled advisory panel meeting. *Our clinical data continues to demonstrate statistical significance with respect to measurable endpoints including angina (chest pain) relief and increases in myocardial perfusion (blood flow into the heart muscle).*"

Amended Complaint ¶ 65. Plaintiffs criticize this release for reporting findings based on unreliable data.

## XI

Finally, on May 27, 1997, PLC issued this release.

PLC SYSTEMS, INC. (AMEX:PLC) today announced that the Food and Drug Administration (FDA) has granted the Company's request to expand the number of clinical sites available to treat patients with The Heart Laser (TM) Transmyocardial Revascularization (TMR) System. Thirty-five clinical sites may now enroll end-stage coronary artery disease (CAD) patients, a substantial increase from the 20 previously FDA approved sites for this patient group.

"We believe the FDA's decision to authorize the Company's request to increase the number of clinical sites is a positive indication for The Heart Laser (TM) TMR System," stated Robert Rudko, Chairman of PLC systems Inc. "This allows the Company to add new sites in the U.S. and continue to treat patients as we prepare for the advisory panel meeting and a potential FDA approval. The FDA recently informed the company that the Premarket Approval (PMA) application for The Heart Laser (TM) TMR system is expected to be reviewed before the circulatory systems advisory panel meeting scheduled for July 28 and 29, 1997."

Amended Complaint ¶ 67. Plaintiffs contend that the release was misleading in attributing positive significance to the action taken by the FDA.

Each of the press releases included an identical small-type disclaimer placed at the bottom of the last page. The disclaimer read:

*Note: Certain of the above statements may be forward-looking statements that involve risks and uncertainties. In such instances, actual results could differ materially as a result of a variety of factors including competitive developments and risk factors listed from time to time in the Company's SEC reports.*

On July 22, 1997, PLC announced that it had secured commitments to purchase $20 million of the company's 5% convertible debentures. Amended Complaint ¶ 69. On July 28, 1997, a majority of the FDA Advisory Panel recommended against approval of The Heart Laser because it deemed the data derived from the Controlled Study insufficient to demonstrate a therapeutic benefit. PLC common stock immediately plummeted from $25.50, its closing price on Friday, July 25, 1997, to $13.12 at the end of the trading session on Tuesday, July 29, 1997.[2] This class action was filed on August 1, 1997. The Amended Complaint was filed on February 13, 1998. On April 24, 1998, the FDA Advisory Panel voted unanimously to approve marketing of The Heart Laser.

## LEGAL STANDARDS

When considering a motion to dismiss, "[w]e must accept the allegations of the complaint as true, and if, under any theory, the allegations are sufficient to state a cause of action in accordance with the law, we must deny the motion to dismiss." *Vartanian v. Monsanto Company*, 14 F.3d 697, 700 (1st Cir.1994). The complaint must contain "factual allegations, either direct or inferential, respecting each material element necessary to sustain a recovery under some actionable theory." *Glassman v. Computervision Corp.*, 90 F.3d 617, 628 (1st Cir.1996), quoting *Gooley v. Mobil Oil Corp.*, 851 F.2d 513, 515 (1st Cir.1988). The court may disregard unsupported assertions and legal conclusions in its analysis. See *Shaw v. Digital Equipment Corp.*, 82 F.3d 1194, 1216 (1st Cir.1996). However, the court must indulge "every reasonable inference helpful

to [plaintiffs'] case." *Serabian v. Amoskeag Bank Shares, Inc.*, 24 F.3d 357, 360–361 (1st Cir.1994).

Under Fed.R.Civ.P. 9(b), "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Where securities fraud is alleged, the particularity requirements are even more stringent.

> [G]eneral averments of the defendants' knowledge of material falsity [of disclosures] will not suffice. Consistent with Fed.R.Civ.P. 9(b), the complaint must set forth specific facts that make it reasonable to believe that defendant[s] knew that a statement was materially false or misleading. The rule requires that the particular times, dates, places or other details of the alleged fraudulent involvement of the actors be alleged.

*Serabian*, 24 F.3d at 361 (citations and internal quotation marks omitted). The PSLRA further requires plaintiffs in private securities lawsuits to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). "Even if plaintiffs wish to prove scienter by 'recklessness,' they still must allege, with sufficient particularity, that defendants had full knowledge of the dangers of their course of action and chose not to disclose those dangers to investors." *Maldonado v. Dominguez*, 137 F.3d 1, 9 n. 4 (1st Cir.1998).[3]

## *DISCUSSION*

*Count I—Violations of § 10(b) of the Securities Exchange Act*

■ To state a cause of action under section 10(b) and Rule 10b–5,[4] plaintiff

2. Trading of PLC stock was suspended on Monday, July 28, 1997.

3. While recognizing that Congress in enacting the PSLRA intended to eliminate abuses in private securities lawsuits, the First Circuit Court of Appeals did not perceive the "new standard to differ from that which this court has historically applied." *Maldonado*, 137 F.3d at 9 n. 5 (1st Cir.1998) (citing *Greenstone*

*v. Cambex Corp.*, 975 F.2d 22, 25 (1st Cir. 1992)).

4. Section 10(b) prohibits the use "in connection with the purchase or sale of any security ... [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). Rule 10b–5 provides that:

must plead scienter, a material omission or misrepresentation, and detrimental reliance causing injury, all in connection with the purchase or sale of a security. *Holmes v. Bateson*, 583 F.2d 542, 551 (1st Cir.1978).

## Scienter

■ To satisfy the requirements of Rule 9(b), plaintiffs must plead specific allegations of fact giving rise to the strong inference that defendants said one thing while knowing another. *Serabian*, 24 F.3d at 368. Cf. *Maldonado*, 137 F.3d at 9 ("While Fed.R.Civ.P. 9(b) proscribes the pleading of 'fraud by hindsight,' we also cannot expect plaintiffs to plead 'fraud with complete insight' before discovery is complete"); *Shaw*, 82 F.3d at 1225 ("[W]e cannot hold plaintiffs to a standard that would effectively require them, pre-discovery, to plead evidence").

While plaintiffs are not altogether firm on the point, they do not allege that the defendants' public statements were knowingly false in the sense that they reported fictional clinical findings supporting The Heart Laser's efficacy. Rather, plaintiffs argue that defendants committed fraud by publicly reporting results that they knew or should have known were either so incomplete or so statistically flawed as to lack clinical significance. Moreover, plaintiffs allege that defendants knowingly or recklessly[5] made reassuring statements about The Heart Laser's approval track at the FDA when in the absence of complete data, they knew or should have known that FDA approval, at least in the projected time frame, was highly improbable. The defendants' motive, according to plaintiffs, was to obtain debt financing on favorable terms. Amended Complaint ¶ 69. See *Cohen v. Koenig*, 25 F.3d 1168, 1174 (2d Cir.1994) (allegation that defendants sought to induce sellers to extend credit to buyers sufficient to satisfy Rule 9(b)).

## Material Misrepresentation

■ The law does not impose an affirmative duty on a defendant to disclose non-public information. *Chiarella v. United States*, 445 U.S. 222, 235, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980). A company will be found liable under Rule 10b–5 only where it has affirmatively misled investors into purchasing its stock by publishing materially false or incomplete information. See *Central Bank v. First Interstate Bank*, 511 U.S. 164, 177, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994); *Gross v. Summa Four, Inc.*, 93 F.3d 987, 992 (1st Cir.1996); *Shaw*, 82 F.3d at 1202; *Roeder v. Alpha Industries, Inc.*, 814 F.2d 22, 26 (1st Cir. 1987).

[W]hen a corporation does make a disclosure—whether it be voluntary or required—there is a duty to make it com-

[i]t shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

 (a) To employ any device, scheme, or artifice to defraud,

 (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

 (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5 (1987).

5. Defendants, relying on a Massachusetts district court case, *Friedberg v. Discreet Logic, Inc.*, 959 F.Supp. 42, 49 n. 2 (D.Mass.1997), suggest that under the PSLRA recklessness is no longer sufficient to establish scienter. Most courts have either assumed that recklessness continues to be one of the required states of mind subject to the PSLRA's heightened pleading standard, see, e.g., *Press v. Chemical Investment Services Corp.*, 166 F.3d 529, 537–538 (2d Cir.1999), or have specifically declined to follow *Friedberg*, see, e.g. *Lirette v. Shiva Corp.*, 27 F.Supp.2d 268, 282 (D.Mass.1998). For the reasons stated by Judge Young in *Lirette*, I do not believe that Congress in enacting the PSLRA intended to eliminate recklessness as an alternative means of establishing scienter. Id., at 281–282. See also *Maldonado*, 137 F.3d at 9 n. 4.

plete and accurate. This, however, does not mean that by revealing one fact about a product, one must reveal all others, that, too, would be interesting, market-wise, but means only such others, if any, that are needed so that what was revealed would not be 'so incomplete as to mislead.'

*Backman v. Polaroid Corp.*, 910 F.2d 10, 16 (1st Cir.1990) (en banc) (quoting *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 862 (2d Cir.1968)). To survive a motion to dismiss, a complaint must specify "(1) the statements that the plaintiffs contend were fraudulent, (2) the identity of the speaker, (3) where and when the statements were made, and (4) why the statements were fraudulent." *Lirette*, 27 F.Supp.2d at 275. See also 15 U.S.C. § 78u–4(b)(3)(A). Whether a statement is misleading and whether adverse facts are adequately disclosed are generally questions that should be left to the trier of fact. *Fecht v. Price Co.*, 70 F.3d 1078, 1081 (9th Cir.1995). "[O]nly if 'reasonable minds' could not disagree that the challenged statements were not misleading should the district court dismiss under 12(b)(6)." *Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996).

The Amended Complaint alleges that PLC's press releases contained false and misleading statements extolling the results of the Controlled Study and the prospects of The Heart Laser's approval by the FDA. In broad terms, the alleged misrepresentations include: (1) false claims that only 6% of the patients receiving TMR died within twelve months compared with 16% of the patients in the control group, when in fact two thirds of the patients who died in the control group did so during or shortly after undergoing TMR; (2) false claims that the FDA had concluded that the clinical data was so encouraging that randomization could be halted and that the number of clinical sites could be expanded; (3) false claims that the Controlled Study had demonstrated positive benefits when the data did not support such a conclusion;

(4) false claims that PLC was "on track" to receive FDA approval to market The Heart Laser; and (5) a misleading account of a presentation made by researchers regarding the results of the clinical trial to the American College of Cardiology. These alleged misrepresentations are the heart of the plaintiffs' case and will be discussed below in more detail.

*Reliance*

While plaintiffs allege that they directly relied on these statements in purchasing PLC stock, they also plead reliance by alleging fraud on the market. A viable section 10(b) fraud-on-the-market claim can be plead without alleging specific reliance. See *In re Fidelity/Micron Securities Litigation*, 964 F.Supp. 539, 546 (D.Mass.1997). The claim is based on the assumption that "in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business.... Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements.... The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations." *Basic Inc. v. Levinson*, 485 U.S. 224, 241–242, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988), quoting *Peil v. Speiser*, 806 F.2d 1154, 1160–1161 (3d Cir.1986). In a fraud-on-the-market case

the statements identified by plaintiffs as actionably misleading are alleged to have caused injury, if at all, not through the plaintiffs' direct reliance upon them, but by dint of the statements' inflating effect on the market price of the security purchased. When the truth is disclosed and the market self-corrects, investors who bought at the inflated price suffer losses. Those losses can be deemed to have been caused by the defendants' statements, even absent direct reliance by plaintiffs, because the state-

ments were presumptively absorbed into and reflected by the security's price. *Shaw*, 82 F.3d at 1218 (internal citations omitted).

*Safe Harbor*

Defendants argue that because the disputed press releases were predictive in nature, and carried a disclaimer, they fall within the safe harbor provision of the PSLRA.[6] 15 U.S.C. § 78u–5(c)(1)(A)(i). Defendants maintain that no reasonable investor, who had bothered to consult the cautionary language in PLC's SEC reports, would have understood PLC's optimistic forecasts of FDA approval as a guarantee. Defendants' Memorandum, at 14–15.

## ANALYSIS

Defendants group the plaintiffs' allegations into five useful categories for discussion. Defendants' Memorandum, at 10. They are:

- allegations that PLC misrepresented the prospects for FDA approval of The Heart Laser (releases I, V, VI, VIII, X, XI);
- allegations that PLC published misleading comparisons of mortality rates between the medical therapy control group and the TMR group (releases I, II, V, IX);
- allegations that PLC misrepresented the basis for the FDA's decision, taken in September of 1996, authorizing PLC to stop the "randomization" of patients into the control group as well as the

basis for the FDA's decision, taken in December of 1996, authorizing PLC to expand the clinical trial (releases II, III, IV, XI);

- allegations that PLC failed to disclose material details regarding the clinical trial (releases I, II, III, V, VI, VII); and
- allegations that PLC's statements publicizing the results of the clinical trial were misleading because of design flaws and statistical bias (releases II, V, VI, IX, X).

*FDA Approval (I, V, VI, VIII, X, XI)*

 While the PLSRA gives statutory protection to " 'forward-looking' statements accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially," 15 U.S.C. § 78u–5(c)(1)(A)(ii), pre–PLSRA law recognized a similar distinction between statements that are merely predictions about future events and statements that imply a foregone result, particularly, in the present context, statements that suggest privity between the speaker and the third-party decision maker, that is, the FDA.

The disputed statements forecasting FDA action on The Heart Laser are couched in terms that a reasonable investor would recognize as aspiratory:

- (I) "[T]he Company *believes* that this data will satisfy the FDA's request;"
- (V) "PLC believes its ... application ... is on track for approval this year;"

---

**6.** These protections extend only to a "forward-looking statement" defined as:

(A) a statement containing a projection of revenues, income (including income loss), earnings (including earning loss) per share, capital expenditures, dividends, capital structure, or other financial items;

(B) a statement of the plans and objectives of management for future operations, including plans of the issuer;

(C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission;

(D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), (C);

(E) any report issued by an outside reviewer retained by an issuer, to the extent that the report assesses a forward-looking statement made by the issuer; or

(F) a statement containing a projection or estimate of such other items as may be specified by rule or regulation of the Commission.

- (VI) "[E]xpedited review ... *may* compress the remaining process time.... We *believe* the recent filing ... allows PLC Systems to remain on track for an FDA approval this year;"
- (VIII) "[W]e *expect* that full approval could be granted in the summer months;"
- (X) "We are very *excited* about presenting the clinical results ... at the scheduled advisory panel meeting;"
- (XI) "We *believe* the FDA's decision ... is a positive indication."

Defendants make a forceful argument that these statements, when read in conjunction with PLC's standard disclaimer and SEC filings,[7] fall within the PSLRA's safe harbor provision. They also are not actionable under pre-existing securities law. "[W]hile it is true that a 'guarantee' of approval of a product by a federal agency might be actionable, ... the key word is 'guarantee.' Mere expressions of hope or expectation regarding future approval, not worded as guarantees, are not actionable." *In re Medimmune, Inc. Securities Litigation,* 873 F.Supp. 953, 964 (D.Md.1995). See also *Raab v. General Physics Corp.,* 4 F.3d 286, 290 (4th Cir.1993).

*Mortality Rates (I, II, V, IX)*

■ Plaintiffs allege that PLC's assertion in the August 15, 1996 release (I) (substantially repeated in the September 10, 1996 release (II)), that the overall mortality rate in the TMR group was 6%, contrasted with 16% in the control group, was grossly misleading. Plaintiffs claim that the release masked the fact that a number of the deaths reported in the Controlled Group were of patients who had been "crossed-over" and who died after receiving TMR. "In truth, two-thirds of the patients in the control group who died,

died *after* undergoing TMR using The Heart Laser." Plaintiffs' Memorandum, at 7. Plaintiffs insist that the actual data available to PLC demonstrated no mortality benefit at all from TMR. Defendants counter that the method used by PLC to compile its clinical statistics, "the so-called 'intent to treat' analysis under which all patients including 'crossovers' are accounted for according to their initial treatment assignment ... was not only generally accepted in the scientific community, but the preferred manner of analyzing such data." Defendants' Memorandum, at 17. Defendants direct the court's attention to several scientific articles and texts espousing this view. However, these materials lie outside the scope of the pleadings and therefore cannot be fairly considered in deciding a 12(b)(6) motion to dismiss. See *E.E.O.C. v. Green,* 76 F.3d 19, 24 (1st Cir.1996).

On the other hand, two statements alleged to fall into this category refer to the mortality data at such a high order of generality as to be nonactionable. These are the statement in the February 13, 1997 press release (V), that "[a]ll of the data collected on TMR using The Heart Laser continues to support the procedure as a potential treatment for patients with coronary artery disease," and the statement in the April 30, 1997 release (IX) that "less than 10% of the patients in the control group remained event free over a twelve month period." It is highly doubtful that an astute reader would have recognized these bland declarations as references to the mortality comparison.

*Randomization and Expansion of the Clinical Trial (II, III, IV, XI)*

■ Plaintiffs allege that PLC in four press releases misrepresented FDA deci-

---

7. PLC's June 30, 1996 Form 10Q, for example, contained the following caution:

 Although The Heart Laser has been granted "expedited review" by the [FDA], given the current uncertainties of the time required by the FDA to approve a Pre-market Approval ("PMA") application, the Company cannot project when, if at all, such approval would be granted. Until PMA approval, continued profitability will likely be determined by the number of international shipments and the related mix of sales and placements.
 Id. at 9.

sions to authorize a halt to the randomization of patients and to permit the expansion of the number of clinical sites by attributing regulatory significance to actions that were purely ministerial in nature. Defendants respond that plaintiffs have failed to cite any specific facts, other than an after-the-fact statement by an FDA official, that would suggest that PLC knew, or should have known, that these statements were false when made. PLC insists that if it erroneously characterized the FDA's actions, the error was at worst an innocent misinterpretation on its part. "There is no basis whatever for inferring that at the time the FDA approved PLC's request to stop randomizing patients, PLC was not justified in assuming that permission had been granted based on the test results it submitted together with the request." Defendants' Memorandum, at 20. The releases of September 10, 1996(11) and October 23, 1996(III), however, specifically ascribe the FDA's randomization decision to its review of PLC's clinical data. Thus, so much of release II stating that "[d]ue to the dramatic differences in the clinical outcomes between the TMR group and the medical therapy group the FDA has allowed PLC Systems to stop randomizing patients," and so much of release III claiming that "[a]s a result [of reviewing the data], the FDA allowed the Company to stop randomizing patients to medical therapy," are actionable. If defendants merely assumed the significance of the FDA's permission to halt randomization (as they suggest in their memorandum), then it was reckless to make the factual assertion that the presentation of the data and the FDA's action were causally connected. Presented as assertions of fact, the capacity of the statements to mislead is apparent. A reasonable investor would have concluded from these statements that the FDA had made a preliminary endorsement of The Heart Laser's therapeutic efficacy.

██ On the other hand, the statements regarding the FDA's decision to permit expansion of the clinical trial, that is, the statement in PLC's December 4, 1996 release (IV) characterizing "the news" from the FDA allowing the enrollment of an additional 100 patients as "very positive," and the statement in the May 27, 1997 release (XI) professing PLC's belief that "the FDA's decision to authorize the Company's request to increase the number of clinical sites is a positive indication" are sufficiently premonitory to be nonactionable.

*Failure to make full disclosure (I, II, III, V, VI, VII)*

Plaintiffs allege that the releases of August 15, 1996(I), September 10, 1996(II), October 23, 1996(III), February 13, 1997(V), February 26, 1997(VI), and March 19, 1997(VII), which reported results of the clinical trial, were misleading because they omitted material details of the testing protocol and because they failed to disclose negative or inconclusive findings. Plaintiffs, for example, criticize the August 15, 1996 release (I), for stating that "the TMR data ... confirms that TMR may be an effective therapy" without disclosing the fact that for terminal patients suffering from unstable angina, TMR appeared to hasten death. Plaintiffs fault the same release for not disclosing that the clinical trial had been designed for 200 (not 100) patients, and that the testing protocol required the amassing of a year's worth of data (not six months). Plaintiffs also allege that the release described the results of the trial as showing "significant differences in the clinical outcomes between the TMR group and the medical therapy group," when, in fact, no statistically significant difference between the two groups was found with respect to the study's primary endpoint of blood perfusion.

██ Plaintiffs' criticism is not that what was said was inaccurate, but that it was incomplete, thus portraying the results of the clinical trial in an unduly optimistic light. For the most part, the complaints are more quibble than material. A

reasonable investor would be interested in whether TMR might prove to be an effective therapy for the majority of patients suffering from end-stage coronary disease without being overly concerned that it might offer little or no benefit to a small subset of patients suffering from unstable angina. Similarly, whether the data was derived from a study of 100 or 200 patients might interest a medical researcher, but would not be an influential factor in making an investment decision. Finally, the phrasing of the statement in release I, "[i]n reviewing the clinical data at six months follow-up," makes clear that the data referred to are interim, and not the final results of the clinical trial. ·

 The failure to disclose the fact that the six month data showed no significant improvement in perfusion, the study's primary endpoint, is more troubling, as the absence of any such improvement might signify to a sophisticated investor that TMR offered no long term benefit to end-stage patients generally. The Amended Complaint does not allege that PLC concealed negative data, but that it failed to disclose that the six month data did not, at least yet, show a statistically meaningful increase in perfusion. One might fairly, without a fuller explanation of the study's protocol, regard the absence of a positive result in perfusion to be an adverse finding. On the other hand, when PLC announced for the first time, in its February 26, 1997 release (VI), that the clinical results "have demonstrated . . . statistically significant increases in perfusion," the Amended Complaint concedes that the

statement was true. Id. ¶ 64(b). While the issue is close, consistent with the principle that "whether adverse facts are adequately disclosed [is] generally . . . left to the trier of fact," *Fecht*, 70 F.3d at 1081, I conclude that the failure to disclose the perfusion results in the August 15, 1996 release (I) and the September 10, 1996 release (II) is actionable.[8]

Plaintiffs complain about similar omissions in the February 13, 1997 release (V). The release rather blandly states that "[a]ll of the data collected on TMR using The Heart Laser continues to support the procedure as a potential treatment for patients with coronary artery disease." A statement by a company commending the "potential" of its own product is hardly the stuff upon which reasonable investors base their decisions.[9]

Finally, plaintiffs complain that the March 19, 1997 release (VII), describing a presentation of results from the clinical trial to a meeting of the American College of Cardiology omitted several negative comments made by the presenters (who were apparently unaffiliated with PLC). Plaintiffs fail, however, to identify the speakers or the actual content of their statements. The only speaker quoted by name is a Duke University Professor, Dr. James Lowe. Dr. Lowe is quoted in the Amended Complaint as heralding The Heart Laser as "an exciting new therapy" which "in my opinion . . . should not be performed on patients with unstable angina."[10] Plaintiffs fail to explain why the failure to reference Dr. Lowe's largely lau-

---

**8.** The releases of October 23, 1996(III) and February 13, 1997(V) do not contain statements purporting to report "hard" data derived from the clinical trial.

**9.** The same is true of PLC's statement touting The Heart Laser as having "the potential to be a leading device in the treatment of heart disease" (release VI).

**10.** "Unstable angina" is:
(1) a[ngina] pectoris characterized by pain in the chest of coronary origin occurring in

response to progressively less exercise or fewer other stimuli than ordinarily required to produce a[ngina]; often leading to myocardial infarction, if untreated, and caused by coronary artery spasm rather than increased myocardial oxygen and demand. (2) a[ngina] that has not achieved a constant or reproducible pattern in 30 or 60 days.
*Stedman's Medical Dictionary* 84 (26th ed.1995).

datory opinion in the March 19 press release was a material misrepresentation.

*Insufficient Data and/or Flawed Methodology (II, V, VI, IX, X)*

 This last category consists of various criticisms of the data generated by the clinical study, the alleged defects of which plaintiffs attribute to its design and methodology:

(a) The purportedly statistically significant improvement in myocardial perfusion at a p=0.001 level was meaningless because it was not based on any comparison to a control group;

(b) The purportedly statistically significant difference in myocardial perfusion between the control and treatment groups was in fact present only in the 12 month sampling, and that sample included less than half of the enrolled patients, so it might be the result of selection bias;

(c) The statement that "More than 70% of the treated group remained event-free for the 12 months following the procedure" was based on a subset, which included less than half of the originally enrolled patients, so that the apparently positive results might be the result of selection bias;

(d) Dr. Rudko's statement, "the correlation between the reduction in angina and the increase in perfusion," was misleading because in the randomized study there was very little correlation between reduction in angina and increase in perfusion; and

(e) The statement, "less than 10% of the patients in the control group remained event free over a 12 month period" was misleading because many of the "events" experienced by patients in the control group, *including twelve deaths,* occurred after the control group patients underwent TMR.

**11.** The Heart Laser received the FDA advisory panel's unanimous approval on April 24,

Amended Complaint ¶ 64. Exactly what is being alleged as fraud is difficult to discern. The securities laws do not impose a duty to conduct "good science," although here, there is nothing in the pleadings other than plaintiffs' opinion to suggest that PLC should have designed a better clinical trial (the FDA, after all, approved the trial's protocol), or that the data generated, even if initially insufficient to satisfy the FDA,[11] were fundamentally unsound or inaccurately reported. "At most, plaintiffs have shown—based on the hindsight provided by the transcript of the FDA hearing and subsequent comments by some panel members—that '[m]edical researchers may well differ over the adequacy of given testing procedures and in the interpretation of test results.'" Defendants' Memorandum, at 24 (quoting *Medimmune,* 873 F.Supp. at 966). See also *In re Syntex Corp. Securities Litigation,* 95 F.3d 922, 930 (9th Cir.1996).

*Conclusion*

In sum, I conclude that the statements asserting a positive mortality comparison between TMR patients and the Controlled Group in releases I and II, as well as the statements asserting a factual link between the submission of clinical trial data and FDA action in releases II and III, and the failure to disclose the absence of data showing an improvement in perfusion in releases I and II, survive the motion to dismiss. As to all other statements alleged to be false or misleading, the motion to dismiss Count I of the Amended Complaint will be allowed.

*Count II—Section 20(a)—Control Person Liability*

Count II of the Complaint alleges violations of section 20(a) of the Securities Exchange Act. Section 20(a) authorizes a cause of action against any individual who exerts direct or indirect control over a corporation that acts in violation of the

1998.

securities laws. Plaintiffs allege that defendants Hibbs and Rudko, as officers and directors of PLC, exercised their power over PLC to cause it to engage in securities violations. Two of the potentially false or misleading statements are quotations attributed directly to the individual defendants. See September 10, 1996 release (II) (Hibbs); October 23, 1996 release (III) (Rudko).[12] Therefore the defendants' motion to dismiss Count II of the Amended Complaint will be denied.

## ORDER

For the foregoing reasons, defendants' motion to dismiss Count I is *ALLOWED* in part and *DENIED* in part. Defendants' motion to dismiss Count II of the Amended Complaint is DENIED.

Defendants' motion to dismiss Count I is *DENIED* with respect to the following statements or omissions:

(1) The statement in the August 15, 1996 release (I) that the mortality rate in the TMR group was 6%, as opposed to a mortality rate in the control group of 16%;

(2) The failure to disclose in the August 15, 1996 release (I) the fact that no improvement had been shown in perfusion;

(3) The statement in the September 10, 1996 release (11) that the overall mortality rate in the TMR group was 6% in contrast with a mortality rate in the control group of 16%;

(4) The failure to disclose in the. September 10, 1996 release (II) that no improvement had been shown in perfusion;

(5) Hibbs' statement in the September 10, 1996 release (11) explaining why the FDA had permitted PLC to stop randomizing patients; and

(6) Dr. Rudko's statement in the October 23, 1996 release (III) explaining why the FDA had authorized PLC to halt the randomization of patients.

The Motion to Dismiss is *ALLOWED* as to all other statements alleged in the Amended Complaint to be false or misleading.

SO ORDERED.

15 U.S.C. § 78u–5(i)(1).

---

**12.** The issue in *Central Bank* was whether section 10(b) covered persons who aid and abet a securities violation. The Court concluded that the statute prohibits "only the making of a material misstatement (or omission) or the commission of a manipulative act," and therefore applied only to those who in fact engage in prohibited conduct, whether "directly or indirectly." 511 U.S. at 176–177, 114 S.Ct. 1439. "Only primary violators, i.e., those who *make* a material misstatement or omission or commit a manipulative act, are subject to private suit under Section 10(b)." *In re Kendall Square Research Corporation Securities Litigation,* 868 F.Supp. 26, 28 (D.Mass.1994) (emphasis in original).